W. H. SHUMM'S ADMX. *v.* RUTLAND RAILROAD COMPANY.

Special Term at Rutland, November, 1907.

Present: ROWELL, C. J., MUNSON, WATSON, JJ., and HALL, Sup. J.

Opinion filed May 8, 1908.

*Negligence—Contributory Negligence—Burden of Proof—Presumption from Instinct of Self Preservation—Railroads—Accident at Crossing—Requisite Care of Traveler at Railroad Crossing—Looking and Listening—Evidence—Sufficiency—Directed Verdict—View by Jury—Effect.*

Due care on the part of one about to cross a railroad requires him to look and listen for an approaching train, and to stop to listen

if that is necessary to enable him to listen effectively, and to con-
tinue to look and listen until the last moment that the discovery
of an approaching train would avail for his protection.  If his
vision is obstructed, he must be specially vigilant as regards his
hearing, and, if in the circumstances his hearing cannot be relied
upon, he must look with special care.

In case for negligence, the burden as to contributory negligence is on
plaintiff, and to discharge it he must submit evidence from which
the jury would be authorized to find affirmatively that no want
of care on his part contributed to the injury of which he com-
plains, but such evidence need not be that of an eye witness.

The presumption that one who realizes his peril will do what he
can to save himself is quite different from a presumption that one
will be prudent and not encounter danger.

In case for negligence, the instinct of self-preservation can never in-
duce the presumption that the danger in question was not im-
prudently encountered.  *Boyden* v. *Fitchburg R. R.*, 72 Vt. 89,
overruled; and *Lazelle* v. *Newfane*, 69 Vt. 306, explained and rec-
onciled.

In an action against a railroad company for the death of a very deaf
man struck by a rapidly moving detached locomotive while he was
walking across the track at a grade crossing, no one seeing the
accident, evidence examined and *held* that it would not authorize
the jury to find that deceased properly looked and listened for an
approaching train; that there could be no presumption, based on
the instinct of self-preservation, that he did so; and, hence, that
a verdict was properly directed for defendant.

If deceased, by seasonably and properly looking and listening, could
have discovered the locomotive in time to have kept off the track,
it cannot avail plaintiff that, if deceased had seen the locomotive
while he was on the track, its speed was so great that he could
not have escaped.

Where a verdict was directed for defendant in an action against a
railroad company for the death of one struck by a locomotive
at a crossing, and there is nothing in the record tending to show
the exercise of due care by the deceased, nor anything that in law
excuses it, the judgment will not be reversed on the conjecture
that the jury in their view of the locality in question may have
seen something not shown by the record.

CASE for negligence. Plea, the general issue. Trial by jury at the March Term, 1906, Rutland County, *Tyler,* J., presiding. Verdict directed for defendant, and judgment thereon. The plaintiff excepted. The opinion fully states the case.

*Butler & Moloney* for the plaintiff.

After a view of the premises by the jury, the court cannot say, as matter of law that there was no evidence tending to show due care by deceased. 2 Wig. Ev. §§ 1162-1168; 1 Met. 222. ."In all such cases the consideration that the jury had means of judging of facts, which cannot afterwards be laid before the court in their complete strength and fulness will always have a prevailing and often a decisive influence upon the judgment of the court in support of the verdict." *Davis* v. *Jenney,* 1 Metc. 222; *Shepard* v. *Camden,* 20 Atl. 91; *Washburn* v. *R. R. Co.,* 59 Wis. 364; *Denver & T. R. Co.* v. *Ditch Co.,* 11 Col. App. 41; *People* v. *Melner,* 122 Cal. 171; *Lane* v. *Evanston,* 150 Ill. 616; *Maynard* v. *Maynard,* 140 Ill. 216.

If the company speed their engines through a village Sunday night without notice, when travelers may be expected on its crossings, and does damage, it must take the natural and probable consequences. This is an exception to the rule as to contributory negligence and the question is for the jury. *Louisville etc. R. Co.* v. *Crominarity,* 41 A. & E. R. C. 513; *Los Ang. Trac. Co.* v. *Conneally,* 39 A. & E. R. C. 107; *Bilton* v. *So. Pac. Co.,* 42 A. & E. Rec. 797.

We are to presume, as matter of law, that deceased in attempting to cross the track, stopped, looked and listened; that is to say, performed his full duty. *Reading etc. R. R.* v. *Ritchie,* 19 A. & E. R. R. Cases 267; *Boyden* v. *R. R. Co.,* 72 Vt. 89; *Lazelle* v. *Newfane,* 69 Vt. 306.

*H. Henry Powers* and *P. M. Meldon* for the defendant.

Neither in the bill of exceptions nor in the evidence do we find any showing, or any attempt to show that the deceased was in the exercise of due or ordinary care, and it is a well settled principle of law that in actions of this character the absence of

negligence on the part of the plaintiff contributing to the injury, must be affirmatively shown by the plaintiff and no presumption of freedom from such negligence arises from the happening of the injury. *Reynolds* v. *N. Y. C. & H. R. R. Co.,* 58 N. Y. 248; *Weston* v. *City of Troy,* 139 N. Y. 281; *Whalen* v. *City Gas Light Co.,* 151 N. Y. 281; *Brooks* v. *Somerville,* 106 Mass. 271; *Allyn* v. *B. & A. R. R. Co.,* 105 Mass. 77; *Murphy* v. *Deane,* 101 Mass. 455.

The quantum of care required of the traveler is exactly prescribed as matter of law. If the traveler could have seen, or by listening could have heard the train, it will be presumed, if a collision occurs, that he did not look or listen, or did not heed what he might have seen or heard. Such conduct is negligence *per se.* *Oleson* v. *L. S. & M. B. R. R. Co.,* 143 Ind. 405; *Chase* v. *Maine Central R. R.,* 78 Me. 346; *Seefeld* v. *Chicago etc. R. R. Co.,* 70 Wis. 216; *Brady* v. *R. R. Co.,* 81 Mich. 616. A traveler must look for extra trains as well as for the regular ones. Pierce on Railroads, 343; *Butterfield* v. *R. R. Co.,* 92 Mass. 542; *Weber* v. *N. Y. etc. R. R.,* 58 N. Y. 451; *Horn* v. *B. & M. R. R.,* 54 Fed. 304.

Where one is killed at a railroad crossing, or the like, and there is no evidence as to what he was doing at the time so as to show freedom from contributory negligence, it is held that his administrator cannot recover, because there is a total failure of proof of an essential element in his case and that it should be taken from the jury. 4 Elliott on Railroads, 1701; *Hinckley* v. *Cape Cod R. R. Co.,* 120 Mass. 257; Beach on Contributory Neg. 423; *Chicago etc. R. R.* v. *Smith,* 141 Fed. 930; *Wabash R. R. Co.* v. *DeTar,* 141 Fed. 932; *St. Louis R. R. Co.* v. *Chapman,* 140 Fed. 129; 3 Elliott on Railroads §§ 1772, 1773; *Tucker* v. *N. Y. etc. R. R.,* 124 N. Y. 308; *Rodrian* v. *N. Y. etc. R. R.,* 125 N. Y. 526; *R. R. Co.* v. *Houston,* 95 U. S. 697; *Cordell* v. *N. Y. etc. R. R.,* 75 N. Y. 330; *Daniels* v. *S. I. R. T. Co.,* 125 N. Y. 407; *Corcoran* v. *B. etc. R. R. Co.,* 133 Mass. 507; *Tyndale* v. *Old Colony R. R. Co.,* 156 Mass. 503.

MUNSON, J. The plaintiff's intestate was killed in the Wallingford yard, at the first crossing north of the station, on Sunday, the third day of January, 1904, about a quarter past five in the afternoon, while walking westwardly directly across

the track, by a "wild engine," coming from the south at a great speed, called by one witness full sixty miles an hour, and without a headlight or any signal other than a whistle nearly half a mile south of the station. There had been a considerable fall of light snow the day and night before, and it was then very cold, with some wind from the north, and some snow in the air. The engine passed with sounds described as unusually loud, emitting clouds of smoke and steam which settled down and around it, and producing a jarring effect noticeable in houses near the crossing, but not noticed by a witness who stood on the west side of the crossing seven or eight rods from the track. Witnesses placed this in the edge of the evening—just about dusk—while it was light but not as light as in broad day; and spoke of the objects testified to as plainly visible.

The line of the railway through this yard is a long curve with the bend to the west. The station is south of the crossing, on the easterly or inner side of the curve. The distance from the crossing to the station is not given, but one witness gives the distance to the water tank as ten or twelve rods, and the station is said to be a little farther south. The size of the building does not appear. There is a side track east of the main track, extending from the station to and beyond the crossing, and east of the siding is a spur track, which ends thirty or forty feet south of the crossing. Along the east side of the spur is a loading platform five feet high. Estimates of the space between the main track and the siding range from five to ten feet. At the time of the accident there were three or four box cars on the siding south of the crossing, and two or three on the spur. The cars on the siding came within about thirty feet of the crossing, and the nearest car on the spur may have been anywhere from ten to fifty feet further south. There is nothing to show how far the side of a box car projects over the rail. There was a pile of wood east of the platform, containing fifteen or twenty cords, which extended north of the platform to within ten or fifteen feet of the crossing, and was about eight feet high at the north end. Of the witnesses who gave their recollection of the number and location of the cars, one testified that the view of a person making a turn from the south onto the crossing would be so obstructed by the cars that he could not quite see to the main line, but that he could probably see down

towards the depot between the cars; and another testified that a person four feet from the east rail of the main track could not see along that track to the south more than ten or twelve rods. The radius of the curve is not given.

A street runs north from the station alongside the yard, with houses on the easterly side facing the tracks. The deceased lived in one of these houses, a little distance north of the crossing, and was employed in shops just over the railroad near the end of the crossing. He had lived and worked in these places for twenty years, and had passed over the crossing four times a day nearly every week day during that time. There have been a few regular trains on Sunday, and occasionally an extra, for several years. The passing of trains usually produced a jarring sensation in the vicinity of the crossing. The deceased was very deaf and had been so for at least thirty years. He could not hear ordinary conversation, but could be communicated with by one standing close to him and speaking very loudly. His son was accustomed to attract his attention by stamping on the floor. He could hear a railroad whistle near by, and knew of the passing of trains by the jarring sensation produced.

The railroad crossing is in a street which runs east and west, crossing the street running north from the depot substantially at right angles. On the occasion of the accident the deceased came up the street from the south, and turned to the left to go over the crossing. A witness who lived in the second house on the south side of the street running east, saw him from her window as he made the turn and approached the side track. She states that he wore a cap pulled down over his ears, and· was walking rapidly, and looking straight ahead. The witness watched him until he ·had crossed the side track and then looked south for the engine, and so was unable to. say whether he looked to the right or the left before coming to the main track. Another witness, who lived in the first house on the south side of the street running east, saw him for a second while sitting by her window, and looked away, fearing an accident. She described him as between the two tracks going straight ahead, and could say no more. The deceased's cap had a flap that could be pulled down to cover the ears, and he was wearing it in that manner a few minutes before the accident. The cap was found the next morning between the main track and the siding,

nearly nine rods north of the crossing, with the flap turned down.  The body was found soon after, in a dismembered condition, about a quarter of a mile from the crossing, on the same side of the track.

A verdict for the defendant was directed on motion at the close of the plaintiff's case.

The general rules applicable in cases of this character are well settled.  One who is about to cross a railroad track must look and listen for an approaching train, and must stop to listen if that is necessary to enable him to listen effectually.  If his vision is obstructed he must be specially vigilant as regards his hearing.  If circumstances are such that his hearing cannot be relied upon he must look with special care.  He must continue to look and listen as he approaches. the track until the last moment when the discovery of a train would avail for his protection.  *Manley* v. *Delaware & Hudson Canal Co.*, 69 Vt. 101, 37 Atl. 279; *Carter* v. *Central Vt. R. R. Co.*, 72 Vt. 190, 47 Atl. 797.

The plaintiff says it is to be presumed that the deceased was exercising the required care at the time he was killed; but the cases cited in support of this claim are from other states.  The rule in this State puts the burden as to contributory negligence on the plaintiff.  It is said in *Walker* v. *Westfield*, 39 Vt. 253, that to make a case upon which the plaintiff can safely rest he must submit evidence upon which the jury would be authorized to find affirmatively that no want of care on his part contributed to the accident.  In *Bovee* v. *Danville*, 53 Vt. 189, the Court declared this to be the doctrine of all our cases, and expressly repudiated any language that might seem to indicate the contrary.

This Court has applied the rule in cases where death has resulted from an unobserved accident.  In *Hyde* v. *Jamaica*, 27 Vt. 465, the intestate was drowned while attempting to drive through a stream at a ford-way.  No one saw him after he entered the stream, and there was nothing to indicate the particular manner in which the accident occurred.  It was assumed in disposing of the case that the intestate was not in fault in attempting to cross the stream.  But it was considered that the law required the exercise of due care while in the stream, and

that this could not be presumed, but was a fact for the plaintiff
to establish.

But it is not necessary that the evidence be that of an eye
witness.   In *Lazelle* v. *Newfane,* 69 Vt. 306, 37 Atl. 1045, the
plaintiff was so injured that he lost all recollection of what
occurred, and the person riding with him was killed.   The
accident occurred on a bridge, and the injuries were caused by
going over the log which formed a guard rail on the side of the
bridge.   The plaintiff had a gentle, manageable and safe horse,
with which he was familiar, and was driving towards the bridge
on a walk when last seen.   The wheel tracks showed that the
horse came upon the bridge properly, and then cramped the
wagon and backed it against and over the log.   The court con-
sidered that these circumstances were evidence tending to show
that the plaintiff was in the exercise of due care.   The opinion
says that from these facts ''the jury might well infer that the
plaintiff, presumably possessing the common instincts of self-
preservation, did not contribute in any degree to the accident.''
The writer of this opinion dissented in that case, but his dissent
failed to be noted.   It would seem, however, upon a review of
the opinion, that the clause quoted does not refer to a presump-
tion in aid of the finding that the plaintiff was driving with
due care, but to a presumption that the plaintiff, when suddenly
imperiled by the backing of the horse without his fault, did all
that he could to save himself.   This view relieves the opinion
of any erroneous suggestion that might otherwise be found in it.
It certainly was not intended to limit the opening proposition
of the opinion, that the burden was on the plaintiff to show that
he was not guilty of contributory negligence in any degree.

The *Lazelle* case was cited in *Boyden* v. *Fitchburg R. R.
Co.,* 72 Vt. 89, 47 Atl. 409.   In that case the intestate and his
three companions were killed while attempting to cross a double-
tracked road after the passage of a train on the nearer track,
by a train coming from the opposite direction on the farther
track.   It was stated at the outset that the burden was on the
plaintiff to show that the intestate and his companions were not
guilty of contributory negligence.   But in passing upon defend-
ant's motion that a verdict be directed for a failure in this re-
spect, after referring to evidence which tended to show that the
track could have been seen in the direction of the approaching

train for a considerable distance, the court said: "It may be reasonably inferred from the circumstances, taking into consideration the disposition of persons to take care of themselves and avoid injury, that, while waiting for the freight train to pass, and until they started along, the decedent and his companions looked and listened to guard against any west-bound train which might be approaching on the northerly track." This follows the *Lazelle* case as it might naturally be construed, but is clearly inconsistent with our established doctrines. The instinct of self-preservation cannot be made the basis of a presumption that due care was exercised, where the burden of proving due care is placed on the plaintiff. Nor do we consider this instinct entitled to a recognition inconsistent with our rule. The presumption that one who realizes his peril will do what he can to save himself, is quite different from a presumption that one will be prudent and not incur danger. A multitude of accidents result from the occasional carelessness of people who are generally prudent. "The careless act usually precedes the moment when the natural instincts of self-preservation are aroused." *Chase* v. *Maine Cen. R. Co.*, 77 Me. 62, 52 Am. Rep. 744. Moreover, the requirement of due care cannot be satisfied in this jurisdiction without looking and listening, and the performance of this duty cannot be inferred from the fact of opportunity without relieving the plaintiff from the burden of showing the required care. We could not follow the courts which make an exception in cases where the injured party is killed and there is no evidence regarding his conduct, without departing from the holding in *Hyde* v. *Jamaica*. But if the views expressed in the *Boyden* case were held to be consistent with our decisions, the application made of them could not be sustained; for there were witnesses in that case who saw the occurrence, and all the authorities hold that there is no room for a presumption of due care where there is direct evidence on the subject.

We conclude, therefore, that there is no presumption that plaintiff's intestate was in the exercise of due care, and that the case must be disposed of on the evidence submitted. The intestate was under observation as he approached the track, and almost until the moment of the accident. The undisputed testimony is that he was walking rapidly and looking straight ahead as he passed along the crossing, and that when last seen he had

entered the space between the siding and the main track, and was still looking and walking straight ahead. There is no circumstance disclosed by the evidence that tends to show that he was mindful of the risk incurred.

It is claimed further that the view was so obstructed by the cars, and the speed of the engine so great, that if the deceased had looked for a train his looking would have been of no avail. This leaves out of consideration the fact that the deceased, very hard of hearing at best, had his cap pulled over his ears. But the question will be taken up independently of this circumstance. It is said that if the deceased had seen the engine he would not have had time to get off the track. The question is rather whether he could and should have seen the engine in time to have kept off the track. The deceased was familiar with every feature of the situation. The case leaves the side-track to the north unobstructed; so the last look should have been to the south. The deceased's movements were not dependent on the control of a team, and the arrest of his forward movement could have been practically instantaneous. There is no evidence that brings the end car on the siding nearer to the crossing than thirty feet. Here we are met by the fact that there is no evidence as to the degree of the curve. The only evidence in the case that covers this point, and thus completes the description of the location, is the testimony of two witnesses who gave the position of the cars, and their judgment as to the distance a person approaching the track could have seen to the south. The witness most favorable to the plaintiff stated that in his judgment a person four feet from the east rail could not have seen down the track more than ten or twelve rods. The plaintiff ignores this evidence, and bases her claim wholly upon mathematical calculations in which assumptions supply the place of satisfactory information regarding the curve. But we have evidence sufficiently definite to enable us to use the estimate of the witness understandingly. If we treat the speed of the engine as sixty miles an hour—the highest estimate, and assume that a person walking rapidly covers four miles an hour—as is assumed by the plaintiff, the deceased would go one foot while the engine was going fifteen, or two and one-half feet—the ordinary step of a man walking rapidly, while the engine was going thirty-seven and one-half feet. Then if we assume that the de-

ceased had just stepped over the east rail when struck, which is as far as the evidence can be claimed to indicate, the engine would have been seventy-five feet away when the deceased was four feet from the track, or two steps back from the position in which he was struck. Upon this basis, it would seem that the deceased must have taken the step preceding that which brought him over the nearest rail, with the engine in plain view. If instead of taking that step he had taken a step to the rear, he would have remained in safety. But this treatment of the matter is not presented as the basis of our conclusion. The niceties and assumptions of the calculation are not essential; for if the deceased, when four feet from the rail, could have seen the track for the ten rods estimated by the witness—one hundred and sixty-five feet, it certainly cannot be said that if he had been looking as he reached that point his prudence would have availed him nothing.

It is also claimed that a verdict cannot be directed in a case where the jury have been permitted to view the premises, inasmuch as the things they have seen are evidence, and may embrace matters that are not, and perhaps could not be, included in the case as sent up. We cannot accept this view. If there is nothing in the case submitted to the court that tends to show an exercise of care, or something that in law excuses it, the court will not reverse the judgment on the conjecture that the jury may have seen something not shown by the exceptions.

*Judgment affirmed.*

---

HALL, Superior J., dissenting.

I am unable to assent to the opinion of the majority of the Court because in my view it fails to recognize a sound principle of law,—accepted by this Court a decade ago, and, in effect, overrules two well considered cases of this Court.

On trial of said cause, after plaintiff rested, the court, on motion of defendant, directed a verdict for the defendant upon the ground that the plaintiff had not shown that her intestate was free from contributory negligence.

In considering the question whether the court erred the evidence must be taken in its most favorable light for the plaintiff. *Boyden, Admr.* v. *Fitch. R. R. Co.,* 72 Vt. 89; *Smith* v. *N. Y. Cen. & Hud. River R. R. Co.,* 177 N. Y. 224, 69 N. E. 427. If there are opposing inferences to be drawn from the evidence and circumstances bearing upon the question of contributory negligence it was the duty of the court to submit that question to the jury. This proposition has been too long and too well settled to call for authorities. The inferences which a court might draw from the evidence are not controlling, the question is what inferences might a jury legitimately and reasonably draw therefrom. *Boyden, Admr.* v. *Fitch. R. R. Co.,* 72 Vt. at p. 95.

While the statement of facts in the majority opinion does not differ materially from the following, I have recited certain facts appearing in the record (not recited in the majority statement), especially with reference to the character, habits, and caution of plaintiff's intestate, which seem to me to have an important bearing upon the question of contributory negligence.

At Wallingford yard on the date in question the defendant's main line ran northerly and southerly on a curve, with the bend towards the west,—the degree did not appear. On the east side of the main line running to a point north of where the accident occurred there was a switch track or siding. Running from the depot on the east side of the switch track to a point near the crossing where the accident occurred was a spur track. On the switch track or siding, there were three or four box freight cars, on the south side of the crossing, the nearest within thirty feet of it. At the north side of the spur track there was a platform for loading cars. Beside it was a pile of pulp wood, (the north end within fifteen feet of the crossing) of fifteen or twenty cords, ranging from five to eight feet in height; and there were a few cars on the spur track.

It did not appear how far it was from the spur track to the siding, but from the siding to the main track was about ten feet. (The majority opinion adopts "five" feet. There was evidence tending to show that it was "five" feet, and that it was "ten" feet. I adopt that most favorable to the plaintiff). It was in evidence that you could not see southerly from the crossing, on the main line, until within three or four feet of it (and when

within the zone of danger) and then only ten or twelve rods. It did not appear how far south of the crossing the depot was, nor the size or exact location of it, except that it was on the east side of the main line. From south of the depot running along beside the spur was a traveled road leading north of the crossing, called Railroad Street. The crossing where the accident occurred was on a street called Mill Lane, running in an easterly and westerly direction.

On the evening of the accident, Sunday, January 3rd, 1904, it was cold and blustering with the thermometer twenty degrees below zero and the wind blowing from the north; there had been a fall of light snow, and snow was in the air; some lights had been lit. The accident occurred from a quarter to half past five in the evening. Defendant was running a "wild engine" towards the north very fast—two witnesses say at the rate of a mile a minute—several witnesses located at different places say it was running very, *very* fast, that the fact was commented upon at the time, and the engine did not slow up while passing through the village. There was no headlight and no warning by blowing a whistle, (except at a crossing about one-half mile below and southerly of the station) or ringing the bell. When the engine passed through the yard it was emitting clouds of smoke and steam, that settled down around it so that it could hardly be seen—the smoke and steam remaining for a minute or more after the engine passed.

Some said there was a loud rumbling noise, but this was not noticed by a witness seven or eight rods west of where the accident occurred. He testified that clouds of steam and smoke were all around the engine; that the smoke and steam from the engine when seven or eight rods away was what attracted his and his brother's attention.

While two regular trains ran through Wallingford Sunday, it was unusual to run "wild engines" on Sunday. It must be conceded that by reason of the location of the track, the pile of pulp-wood, and cars, as well as the curve that obstructed the vision until close to the main track, the speed at which this "wild engine" was run on Sunday evening, without headlight, not slowing up in the village nor giving warning, was *gross* negligence.

The decedent was a man forty-six years old, sober, industrious, with a wife and three children, and a good provider. His son, who was nineteen years old when his father was killed, testified that while he was deaf, they had no difficulty in conversing with him; that he was more cautious than people generally. In cross-examination he was asked "So that any person about to cross that crossing would feel it jar." He answered "Yes, sir, and he (referring to his father) naturally would because he was very cautious, he was more cautious than people generally." In re-direct he said, "Always very cautious, any noise, when a train would be going by the house, he would always know just as quick as the rest of us."

Decedent's house was a short distance east of the crossing and he went over that crossing for years, four times a day to and from his work, and was perfectly familiar with it. On the night in question he left his house to get a Sunday paper somewhere down on Railroad Street; returning he started to cross the tracks and his body was found, with the left leg severed, about one-half mile north, on the following morning. No one saw him when the accident occurred or could tell just how it occurred.

Railroad street was four or five rods wide at the crossing. A lady in the corner house on the east side, southeast of the crossing, looking diagonally through the north window, saw the back and side of a man for an instant only, but not plain enough to know who it was. She thought he was tall but could not tell whether he was large or small—she emphasizes that it was only a second by repeating that word several times. She thought he was between the main track and siding. She did not testify whether standing still or walking. She could not tell whether he had on a cap or not. She heard the engine but did not see it. She was not much alarmed, for she thought if he went straight across he would get across, but if he did not go straight across he might get hurt.

Another lady, who was a witness, lived in the second house east of the corner, on Mill Lane. She heard the engine and got up and went and looked out of the window and saw a tall, slim man whom she did not know, going west towards the railroad crossing, almost onto the switch. When the engine passed, the smoke and steam hid him. The smoke and steam were down

towards the track and lingered for a minute or two.  There was lots of fire as the engine passed and the snow flew.  She said the man she saw was walking fast—with his cap pulled down over his ears, with his hands in his pockets, looking straight ahead so that he could see anything in his way.  The thought· came into her mind that he might be harmed by the engine.

The witness before alluded to, who, with his brother, was a short distance west of the track, did not see Shumm at all.

It cannot be claimed, in the circumstances, the location of the houses, the time in the evening, the casual seeing of a man whom they did not recognize, that the tenor of the evidence of the two ladies is very satisfactory, or that a jury would have found, from such evidence, that plaintiff's intestate was guilty of contributory negligence.

Still the majority opinion with no other basis than the evidence of the two witnesses just referred to, who were in houses east of Railroad Street, says: ''The intestate was. under observation as he approached the track, and almost until the moment of the accident.  The undisputed evidence is· that he was walking rapidly and looking straight ahead as he passed along the crossing, and that when last seen he had entered the space between the siding and the main track, and was still looking and walking straight ahead.''

An instantaneous looking through a window, diagonally, without being able to distinguish the person, can hardly be called ''observation.''  .

At the time these witnesses saw him it would have been *absolutely useless* to have looked south, for he could not have seen past the wood and cars until he had walked several feet farther, and then only when so near the main line as to be in the ''zone of danger.''

The fact is beyond cavil that no one saw him when decedent could have seen or apprehended danger.  Again, the majority opinion assumes that he was traveling at the rate of four miles an hour.  If so, witness Pickett and his brother must have seen him.

While one witness uses the word ''rapidly'' as applied to his walking, it must be borne in mind that it was very cold, the wind was blowing from the north and the ground was frozen.

It is submitted that three miles an hour would be rapid under such conditions.

The engine was running at the rate of about eighty-five feet per second. It would only take two seconds from the time it came in sight, near the main track, for it to pass.

The witnesses on the opposite side heard no signal, and their attention was attracted only by the escaping smoke and steam. Just what transpired in two or three seconds no one knows. As that "wild engine" came bowling along, surrounded by smoke and steam and snow, without warning, plaintiff's intestate was caught and carried to his death—just how no one can conjecture. We know that his left leg was cut off, his right arm broken and he was badly bruised, but none of these injuries give a clue as to how he was struck or caught.

The burden of proof was upon the plaintiff to show that decedent was not guilty of contributory negligence. While in this State, it cannot be presumed, as matter of law, that the decedent was in the exercise of due care and prudence, it must be conceded that, if the facts and circumstances tend to show that plaintiff's intestate *was* in the exercise of due care and prudence, that question should have been submitted to the jury.

Dresser on Employer's Liability, p. 375, referring to states where the rule is similar to our own, says: "It must in some way appear from the plaintiff's evidence that he exercised care, but direct affirmative evidence of the plaintiff's care is not required, and his due care may, upon all the circumstances, be inferred from absence of fault."

In *Mayo* v. *Boston & Maine R. R. Co.*, 104 Mass. 137, it is held that to sustain an action for an injury received by the plaintiff through the defendant's negligence, it is not necessary for the plaintiff to prove due care on his part by direct affirmative evidence, but the inference of such care may be drawn from the absence of all appearance of fault, either positive or negative, on his part, in the circumstances under which the injury was received.

*Robinson*, J., in *Pittsburgh etc. Ry. Co.* v. *Parish*, 28 Ind. App. 189, 62 N. W. 514, 91 Am. St. Rep. 120, well says: "Slight positive testimony, whether circumstantial or otherwise, when taken in connection with the instincts of self-preservation, and the desire to avoid pain or injury to one's self, may be sufficient

to support a conclusion that one who suffers injury did not help to bring it upon himself''; and cites *Allen* v. *Willard*, 57 Pa. St. 374; *Chicago etc. R. R. Co.* v. *Gunderson*, 174 Ill. 495, 51 N. E. 708; *Hopkinson* v. *Knapp*, 92 Ia. 328, 60 N. W. 653; *Greenleaf* v. *Illinois etc. R. R. Co.*, 29 Ia. 14, 4 Am. Rep. 181; *Gay* v. *Winter*, 34 Cal. 153; *Evansville St. R. R. Co.* v. *Gentry*, 147 Ind. 408, 44 N. E. 311, 37 L. R. A. 378, 62 Am. St. Rep. 421; *Cincinnati etc. R. R. Co.* v. *McMullon*, 117 Ind. 439, 20 N. E. 287, 10 Am. St. Rep. 67; *Illinois etc. R. R. Co.* v. *Nowicki*, 148 Ill. 29, 35 N. E. 358; *Citizens' Street R. R. Co.* v. *Ballard*, 22 Ind. 151, 52 N. E. 729.

What are the facts and circumstances making in plaintiff's favor?

Negligence is a shortage of duty which one owes to another. It is not presumed. Contributory negligence has this additional feature, it is a shortage of duty which one owes to himself. If negligence cannot be presumed, how much less can contributory negligence?

Mr. Shumm approached that crossing with full knowledge as to conditions so far as pulp-wood, cars and obstructed vision were concerned. This was a circumstance prompting care. He was of mature age, with a family dependent upon him, temperate, prudent and ''more cautious than men in general.''

While it is true that he was deaf, it is common knowledge that when one faculty is impaired, others take up its work. And the evidence shows that ''any noise, when a train would be going by the house, he would always know just as quick as the rest of us.'' His wife said he always felt a jar; they attracted his attention by stamping on the floor.

It is said in the majority opinion that ''the case leaves the side-track to the north unobstructed; so the last look should have been to the south.'' I cannot subscribe to this. It is the calm deliberation of the jurist, not upon the ground, nor in the presence of danger, but in the quiet and security of his study. Such deliberation has never been, and in my opinion never should be, the test. No man is required to use greater caution than that of a man of ordinary care and prudence in the same circumstances. Had he looked south and seen nothing, and then looked north, during the time occupied, the engine would have been down upon him without warning.

The majority opinion says that "it is not necessary that the evidence be that of an eye witness," and quotes from *Lazelle* v. *Newfane,* 69 Vt. 306, 37 Atl. 1045, "the jury might well infer that the plaintiff, presumably possessing the common instincts of self-preservation did not contribute in any degree to the accident," but criticises and attempts to limit the scope of that decision.

In my opinion the quotation is a sound proposition, and the instinct of self-preservation should have been weighed with other evidence and circumstances in the case, tending to show that plaintiff's intestate was not guilty of contributory negligence. Had this been done, who will question but what there were opposing inferences to be drawn from the evidence? What would a jury whose special province it is to pass upon such questions have said? The answer is self-evident.

After the decision in *Lazelle* v. *Newfane,* 69 Vt. 306, and the decision in *Boyden, Admr.* v. *Fitch. R. R. Co.,* 72 Vt. 89, the profession understood that Vermont was placing herself in line with the decisions of other states, and that if no one saw the decedent when killed, it would be presumed that he was exercising due care; but if those cases are not to be construed as going to that extent, if the case at bar is to be measured by the standard of either, it should have been submitted to the jury upon the question of contributory negligence.

Quoting from the opinion of *Taft,* J., "To entitle the plaintiff to recover, it was not necessary that there should have been an eye witness to the transaction, who can be called to testify to the circumstances attending the accident; the direct testimony of a person witnessing the accident is not required; the manner of the accident, the cause of it and fault, if any of either party, may be inferred from the facts shown and detailed by the witnesses."

In another part of the opinion the Court says: "The jury might well infer that the plaintiff, presumably possessing the common instincts of self-preservation, did not contribute in any degree to the accident."

Again: "They could infer from the circumstances shown by the testimony, the neglect of the town, the proximate cause of the accident, that the plaintiff was without fault."

In *Boyden, Admr.* v. *Fitch. R. R. Co., Watson,* J., on p. 94, after referring to the negligence of defendant, says: "It may be reasonably inferred from the circumstances, taking into con-sideration the disposition of persons to take care of themselves and avoid injury, that, while waiting for the freight train to pass, and until they started along, the decedent and his companions looked ånd listened to guard against any west-bound train which might be approaching on the northerly track." *Lazelle* v. *Newfane,* and *Baltimore etc. R. R. Co.* v. *Griffith,* 159 U. S. 603, 16 Sup. Ct. 105, 40 L. Ed. 274, are cited, and the court concludes: "and not seeing nor hearing any, thought it safe to cross." Further on: "A jury might find from the evidence and the legitimate and reasonable inferences therefrom, that when the team started along, the express train had not come in view, with the track unobscured, and when approaching, the noise made thereby so mingled with or was drowned by the noise of the freight train that, in the absence of the usual warning by whistle or bell, the decedent and his companions were deceived into thinking there was no train approaching."

The decisions in *Lazelle* v. *Newfane,* and *Boyden, Admr.* v. *Fitch. R. R. Co.,* were apparently given after mature deliberation. More than a decade has elapsed since the first, and nine years since it was followed and quoted from with approval in the second case. In the first case *Start,* J., submitted the question to the jury. The opinion of the Court was by *Taft,* J., and was concurred in by *Ross,* C. J., *Rowell,* and *Tyler,* JJ. The opinion in the last case was by *Watson,* J., and was concurred in by *Rowell, Tyler, Start,* and *Thompson,* JJ. While it is true that *Munson,* J., appears as dissenting, no dissenting opinion was given by him.

The majority opinion, referring to these decisions, says they are "clearly inconsistent with our established doctrines. The instinct of self-preservation cannot be made the basis of a presumption that due care was exercised, where the burden of proving due care is placed upon the plaintiff. Nor do we consider this instinct entitled to recognition inconsistent with our rule."

As I read the opinion it does away with the settled and accepted law since *Lazelle* v. *Newfane,* and *Boyden, Admr.* v. *Fitch. R. R. Co.,* but the majority opinion leaves the profession

to speculate as to how much if any of the law laid down in those cases is still the law in this State.

These decisions are in line with the judicial utterances of the highest court in the land and with the later decisions of a large number of states, among which may be numbered the United States Supreme Court, the Federal Courts, Maine, New Hampshire, Rhode Island, New York, Pennsylvania, Wisconsin, Michigan, Missouri, Illinois, Iowa, Maryland, Indiana, California, and others.

If our decisions are in conflict with doctrines established by our Court before the decisions were rendered, is that a reason why they should be reversed, the hands turned back upon the dial, and we go back to a decision that is arbitrary and so severe that, regardless of the fact, if there was no eye witness to the circumstances attending death by negligence, the decedent's next of kin are without remedy because they cannot show by direct and positive evidence freedom from negligence?

Mr. Wigmore in his work on Evidence, Vol. IV, sec. 2570, says: "The natural instincts of human conduct with reference to care and negligence at a time of danger may be considered."

It may be well to quote from some of the decisions. Mr. Justice McKenna in *B. & P. R. R. Co. et al.* v. *Lanrigan, Admr.*, 191 U. S. 461, 24 Sup. Ct. 137, 48 L. Ed. 262, says: "There was no error in instructing the jury that, in the absence of evidence to the contrary, there was a presumption that the deceased stopped, looked and listened. The law was so decided in *Texas & P. R. R. Co.* v. *Gentry*, 163 U. S. 353, 16 Sup. Ct. 1104, 41 L. Ed. 186. The proposition is founded on a law of nature; we know of no more universal instinct than that of self-preservation, none that so insistently urges to care against injury; it has its motive to exercise in the fear of pain, maiming and death; there are few presumptions based upon human feelings or experience that have surer foundation than that expressed in that instruction."

*Doe*, C. J., in *Huntress* v. *R. R. Co.*, 66 N. H. 185, 34 Atl. 154, says: "Where there is no evidence of insanity, intoxication or suicidal purpose, and no evidence on the question of his care except the instinct provided for the preservation of animal life, it may be inferred from this circumstantial proof that, for some reason consistent with ordinary care and freedom from

fault on his part, his attempt to cross was due to his inadequate understanding of the risk.'' This opinion is criticized in *Wright, Admx.* v. *B. & M. R. R.,* 65 Atl. (N. H.) 687, 8 L. R. A. 832. The learned judge delivering the opinion concludes as follows: ''Whether the fact that the deceased in this case was traveling on foot, while in the *Huntress* case the deceased was riding in a team, constitutes an important distinction between the two cases, it is unnecessary to inquire. If it does not, the *Huntress* case must be overruled.'' Both opinions are cited that the profession may determine which contains the better reasoning. Many New Hampshire cases are in line with the *Huntress* case. This presumption is in the nature of evidence and may be weighed as such.

In *Lyman* v. *B. & M. R. R.,* 66 N. H. 200, 20 Atl. 976, 11 L. R. A. 364, it is held, that ''Although proof of due care is essential to plaintiff's case it may, in the absence of evidence to the contrary, be supplied by the presumption that persons of mature years, in the possession of their senses are ordinarily prudent and will exercise ordinary diligence to avoid danger.''

In *Johnson* v. *Hudson River R. R. Co.,* 20 N. Y. 65, 75 Am. Dec. 375, the defendant moved for a nonsuit upon the ground that the plaintiff had not shown that the deceased himself was free from contributory negligence. No witness saw the accident. The Court said: ''The absence of fault on the part of the plaintiff may be inferred from circumstances and the disposition of men to take care of themselves and keep out of difficulty may properly be taken into consideration.''

In *Broadbent* v. *C. G. & T. Ry. Co.,* 64 Ill. Appeals 231, (1896), it was held that there is in all men a natural instinct of self-preservation, and such instinct is an element of evidence of which the jury may take notice and, in the absence of all testimony upon the subject, find that a deceased party in obedience to the ordinary instincts of mankind, exercised that care for his safety which a prudent man in the same circumstances would have made use of.

In *Way* v. *Illinois Central R. R. Co.,* 40 Iowa 345, the Court said: ''The instincts prompting the preservation of life are thrown into the scales as evidence, like the presumptions of sanity and innocence.''

In *Northern Cent. Ry. Co.* v. *State*, 29 Md. 438, 96 Am. Dec. 545, it is said: ''The facts and all the circumstances of the case were proper to be considered by the jury, and in connection with these facts and circumstances, it was competent for the jury to infer the absence of fault upon the part of the deceased, from the general and known disposition of men to take care of themselves and keep out of the way of difficulty and danger.''

In *Strong* v. *City of Stevens' Point*, 62 Wis. 255, 22 N. W. 425, deceased was last seen approaching a bridge in which was a hole wherein he fell and was killed.   It was held that the jury might find that the accident occurred without culpable negligence on the part of the deceased.   This case is cited with approval in 120 Wis. 229, 97 N. W. 946.

In *Alden* v. *Willard*, 57 Pa. St. 375, it was held that the natural instinct which leads men in their sober senses to avoid injury and preserve life, is an element of evidence.

In *Penn. R. R. Co.* v. *Weber*, 76 Pa. St. 157, 18 Am. Rep. 407, where one Weber was killed while crossing a track, the judge delivering the opinion says: ''Whether he stopped, or not, before driving on the track, is matter of mere inference or conjecture, and cannot with certainty be known.   On the one hand is the presumption that he stopped to look and listen. He was well acquainted with the crossing, having been accustomed to drive over it every day, and must have known the time at which the regular trains passed.   He had the highest motive to take the necessary precaution to insure his safety, and the presumption is that he did.   On the other hand, it may be inferred from the circumstances, that if he had stopped to look and listen he would have seen or heard the approaching train.   But whether he stopped, or not, it was the province of the jury to determine as a question of fact, and not a matter of law, for the decision of the court.''

In *Gay* v. *Winter et al.*, 34 Cal. 153, it is held that in cases where the negligence of the defendant is affirmatively shown, and there is no proof of the conduct of the deceased or person injured, the jury are at liberty to infer ordinary care and diligence upon his part, taking into consideration his character and habits as proved, and the natural instinct of self-preservation.

The case should have been submitted to the jury upon the point of no warning.

Plaintiff's intestate had the right to believe that defendant's engineer would obey the law by blowing the whistle or ringing the bell, but there was no evidence of any warning except the blowing of the whistle more than half a mile away with the wind blowing away from the crossing.

*Watson,* J., in *Boyden, Admr.* v. *Fitch. R. R. Co.,* 72 Vt. at p. 93 says: "Although such negligence (failure to blow the whistle or ring the bell) on the part of the railroad company, affords no excuse to the traveler upon the highway, for his not exercising due care and prudence to avoid injury, yet the absence of such warning is a circumstance to be taken into consideration in determining whether he did exercise the degree of care and prudence required or not; for negligence cannot be imputed to a person who is deceived under circumstances calculated to deceive a prudent man."

*Collins,* J., in *Henderson, Admr.* v. *Great Northern R. R.,* 49 Minn. 245, 51 N. W. 1044, 16 L. R. A. 261, 32 Am. St. Rep. 540, says in substance: "Assuming then as we must, for the jury might have so determined, that no continuing or warning signals were given, it must be held that if, by reason of this omission or neglect Mr. Henderson was led to be less vigilant when driving near the railway, his view along the track being obscured until he reached the place or situation in which his life was jeopardized and finally lost, his want of vigilance cannot be pronounced culpable or contributory negligence as matter of law."

In *Pa. R. R. Co.* v. *Ogier,* 35 Pa. 71, 78 Am. Dec. 322, it is held in substance, that if by reason of the negligence of those in charge of the train one is less vigilant, the company is not at liberty to impute the consequences of their acts to his want of vigilance, a quality of which they deprived him.

The case at bar is very similar to one in Michigan in which an eminent jurist gave the opinion. In *Teipel* v. *Hilsendegen,* 44 Mich. 461, 7 N. W. 82, per *Cooley,* J.: "Nor is it necessary that the absence of contributory negligence be shown beyond cavil or question. If the circumstances are such that reasonable minds might draw different conclusions respecting plain-

tiff's fault, he is entitled to go to the jury on the facts.     In this case there was no eye witness of the injury resulting in death. There was some evidence of negligence on part of the defendant and some ground for opinion that intestate was negligent also.     The plaintiff put in such proof of the attendant facts as was attainable, and from these it was by no means clear that the intestate was in fault at all.     There was room for the conclusion that he was not.     We think the case ought to have gone to the jury.''

That other respectable authorities hold the converse view is not questioned, but the cases quoted from indicate the trend of the decisions, and are based upon sound reasoning and common sense.

That this Court made no mistake in going to the extent it did in *Lazelle* v. *Newfane,* and *Boyden, Admr.* v. *Fitch. R. R. Co.,* is amply confirmed by the decisions quoted from.

The defence rely largely upon *Carter* v. *Central Vermont R. R. Co.,* 72 Vt. 190, 47 Atl. 797—a case entirely unlike the case at bar in its controlling facts.

In that case the Court lay down the same rule contended for by the plaintiff in the case at bar, as to when it is the duty of the court to submit a case to the jury, and quote with approval from the opinion of *Start,* C. J., in *Scheiber* v. *R. R. Co.,* 61 Minn. 499, 63 N. W. 1034, in which he says:

''This rule must be applied in practice with caution, lest the courts usurp the functions of the jury, and unwittingly deprive a party of his constitutional right to a trial by jury, and if there is a fair doubt as to the inferences to be drawn from the admitted state of facts, the question must be submitted to the jury; but, in the absence of such fair doubt, it is equally the duty of the court to decide the question as one of law and instruct the jury accordingly.''

It may not be out of place to say that when two judges honestly aiming to arrive at the truth, with the same opportunities for analyzing the evidence, arrive at different conclusions as to the inferences to be drawn therefrom, it is a strong indication that reasonable minds might draw different conclusions respecting the plaintiff's fault, and that if so, the case should have been submitted to the jury.

14

This view was taken in *Smith* v. *N. Y. Cen. & Hudson River
R. R. Co.* (Court of Appeals) 177 N. Y. 224, 69 N. E. 427. In
the opinion of *Werner,* J., concurred in by *Parker,* C. J., *Bart-
lett, Martin* and *Vann,* decided January 19, 1904, the Court say:
''The facts of this case fairly stated and considered in the light
of the circumstances most favorable to plaintiffs do not so clear-
ly establish contributory negligence of plaintiffs' intestate as
to remove the question from the domain of doubt into the realm
of undeniable fact. In support of this suggestion, we have but
to refer to the persuasive, if not conclusive, circumstance that
learned judges have differed as to the effect of the evidence in
this record.''

I concur in the majority opinion that notwithstanding the
fact that the jury had viewed the premises, as the record stands,
the court might order a verdict if the case was not one which
in other respects showed that it should have been submitted to
the jury.

In my opinion the judgment should be reversed.