## BASSETT v. DELAWARE & HUDSON CO.
### No. 51.

Circuit Court of Appeals, Second Circuit.
Dec. 12, 1932.

Joseph Rosch, of Albany, N. Y., and Marvelle C. Webber and James P. Leamy, both of Rutland, Vt., for appellant.

Lindley S. Squires and Fenton, Wing, Morse & Jeffords, all of Rutland, Vt. (Olin M. Jeffords, of Rutland, Vt., of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This action was brought to recover damages for injuries suffered by the plaintiff on February 13, 1929, while crossing the tracks of the Delaware & Hudson Company at a public crossing near Fair Haven in the state of Vermont. The plaintiff at the time was driving a truck loaded with hay, and there was a collision between it and a passenger train of the defendant running from Whitehall, N. Y., to Rutland, Vt., causing the plaintiff's injuries.

The trial court submitted three special questions to the jury, viz.:

Question 1. Was the bell rung continuously for a distance of eighty rods from the crossing? To which the jury answered: "Yes."

Question 2. Was the train run at a careless and negligent rate of speed as it approached and passed over the crossing? To which the jury answered: "Yes."

Question 3. Was the plaintiff guilty of contributory negligence? To which the jury answered: "No."

There was a general verdict upon the special verdicts in favor of the plaintiff awarding him a recovery of $24,612.95. From the judgment entered upon this verdict this appeal has been taken.

On the day of the accident the plaintiff drove a large Mack motortruck from Rutland, Vt., to Whitehall, in order to get a load of baled hay which he was to bring back to Rutland. In going for this load he had to drive over the railroad crossing in question

and he had driven over it on four previous occasions. On returning with the load he approached the crossing (going in an easterly direction) and, when about 200 feet from it, stopped to adjust his load which had not been properly made fast. After adjusting it he looked down the railroad track to see whether a train was coming, remounted his truck, and started easterly to a place on the highway variously estimated to have been from 44 to 20 feet from the nearest point on the railroad where his left front wheel would touch the track if he proceeded along the highway toward the crossing. There he stopped and, looking back along the track, could see a distance of about 1,300 feet and saw no train coming.

The truck weighed 6,775 pounds and had a load of 4,880 pounds, was 20 feet in length, with a platform 6 feet in width. The cab was 4 feet, 8 inches wide, and the hay loaded in three tiers projected 5 inches on each side beyond the platform on which it was piled. The railroad crossed the highway at such a sharp angle that it ran along in the highway and almost parallel to it for a considerable distance, and therefore the plaintiff, when sitting in his cab, could not see far enough down the track behind him so that he could cross in safety unless he leaned out of the truck. He says he did lean out when he stopped at the point estimated at from 44 to 20 feet from the track and which he himself estimated at about 20 feet. He then proceeded to cross the track at an angle which required the truck to traverse a distance of from 112 to 123 feet before the rear end would be clear of the rails. If he had turned his truck further to the left he could have crossed more nearly at right angles and would have had to cover a much shorter distance than by the route he took. The testimony of plaintiff's witness Higgins that there was a plank out or broken near the cement, and that of other witnesses that some of the planks were loose, even if brought down close enough to the time of the accident to afford some evidence of a rough crossing, did not negative the proof that the crossing was entirely practicable and in constant use.

The plaintiff thus described the accident: " * * * I observed the roughness of the crossing and before starting over that crossing I satisfied myself there was no train in sight. I put my left leg out onto my running board and also had thrown my shoulders and head out and could see back to the curve as plain as anything and there was no trains. And as I sat back into my cab, taking my left leg and putting it onto my clutch, throwing it in, and as I was letting out my clutch very slowly, that sets my truck in motion so it just barely moves, and as my truck is just barely moving, I throw my head and shoulders out and glance, look down the tracks and see as far as the curve then, and there is no train in sight. When I had gone the length of the truck in low gear that brought me about onto the rails, the front of the truck was on the rails, and I shifted into second gear then and went along in second gear possibly two and a half or three truck lengths, bearing to the right on account of the roughness of the crossing. I had to pick out the best possible places to go over that on account of the condition of the crossing also the weight of my load, with big heavy chains on. I kept bearing to my right. Then as I commenced to swing toward the east rail, I heard a terrific roaring and I swung my head clear to the milk plant, I had a clear vision and I realized then there was a train, and as I put my head out of the cab I could see the switch, and then, in a case of emergency, I went clear down to the floor boards on my gas. All the time this roaring increased and the next moment I knew I was being carried away. * * * "

The crossing was plainly a country crossing, where cars passed at infrequent intervals. The only pertinent testimony as to travel in wintertime was that of plaintiff's witness G. Berry, who said that the rate of travel over the crossing in winter was one car "every five or six or seven minutes." If the traffic survey from July 16, to October 15, in 1926 (two and a half years before the accident), would have been admissible in any circumstances, it could have no bearing on the present case, for it was made at a point in the village of Fair Haven where two roads met and at a time when tourists were traveling over the highways. It had no relation to the reduced traffic at the crossing in winter.

■ We think that the plaintiff made no case based upon a negligent rate of speed of the train, as it approached the crossing. There was no speed limit required by the laws of Vermont. The crossing was beyond the confines of the Village of Fair Haven at a place where the view of the railroad track was unobstructed for a long distance and there were no circumstances which rendered the crossing peculiarly dangerous. Slowing down at such country crossings would make it impossible for railroads to maintain their time schedules and has never been regarded as necessary. Travelers must rely for security on their own

vigilance and the sounding by the railroads of the signals required by law. They cannot require more protection. Baltimore & O. R. Co. v. Reeves (C. C. A. 6) 10 F.(2d) 329; Pennsylvania R. Co. v. Stegaman (C. C. A. 6) 22 F.(2d) 69; Southern Pac. Co. v. Stephens (C. C. A. 9) 24 F.(2d) 182; Strider v. Penn. R. R. Co. (C. C. A.) 60 F.(2d) 237; Warner v. New York Cent. Railroad Co., 44 N. Y. 465; Mulvaney v. New York Cent. R. Co., 233 Mich. 350, 206 N. W. 536; Newhard v. P. R. R. Co., 153 Pa. 417, 26 A. 105, 19 L. R. A. 563; Haller v. Pennsylvania R. Co., 306 Pa. 98, 159 A. 10; Henry v. Boston & Maine Railroad, 125 Me. 366, 134 A. 193. In Canadian Pacific Railway Co. v. Slayton, 29 F.(2d) 687, we held that the jury might find the rate of speed at a crossing negligent, but the place of collision was in a village.

█ It is claimed that the crossing was especially dangerous because the highway intersected the railroad at an acute angle and the traveler would, therefore, be on the tracks longer than if the intersection were at right angles. But in Southern Pac. Co. v. Stephens (C. C. A. 9) 24 F.(2d) 182, and Baltimore & O. R. Co. v. Reeves (C. C. A. 6) 10 F.(2d) 329, although the crossings were at an acute angle, that fact was held not to alter the general rule. Owing to the original layout of country roads many crossings are at an acute angle.

[3] We do not think that any roughness of the highway was sufficient to require the railroad to reduce its speed. According to the plaintiff's testimony he put his car into second gear after he had gone the length of his truck from the place where he last looked and as he actually got to the westerly track. He remained in second while crossing the tracks and his rate of speed when in second was from five to seven miles per hour. This was rather slow, but there was nothing extraordinary about it and nothing to indicate that the character of the crossing imposed a duty on the railroad to slow down or rendered its speed negligent. Baltimore & O. R. Co. v. Reeves (C. C. A.) 10 F.(2d) 329. Moreover, the condition of the crossing was not submitted to the jury in order to prove negligence, but only to meet the defense of contributory negligence and the declaration did not allege that the railroad maintained an unsafe crossing.

█ Lastly, it is asserted that the railroad was running at a reckless rate of speed. The testimony indicates that before reaching the crossing the train had gone but a little more than 7 miles from Whitehall, its starting place, and had left on time. According to the weight of testimony it was not running over 40 miles an hour. The only witness to the contrary was Mrs. Annabel Berry who saw the train through the window of her house. She was about 1,100 feet from it when it came to the crossing and only saw it as it was approaching her, and had it in sight for a very few feet, perhaps not more than 50, before it disappeared from her view. In spite of this limited range of vision and the long distance of the train from her, she attempted to estimate its speed at from 50 to 60 miles an hour and added: "I saw the train coming down the track at a good speed, as it usually travels." The schedule time from Whitehall to Fair Haven was 12 minutes, and the distance 8.4 miles so the average rate of speed for the distance would be 42 miles per hour. There was no reason for hurrying, and we must conclude that the estimate of this witness was without proper foundation because of her lack of opportunity to see the train for any substantial distance and because she characterized a speed which she judged to be from 50 to 60 miles, as usual, when such a speed was very unlikely. The only other testimony on speed was expert opinion that a train that took as long to stop as this one did must have been going 70 or 80 miles an hour. Such testimony depended on the character and condition of the brakes, which the witnesses had not themselves used, and was speculative; contrary to every reasonable probability and likewise contrary to the trial judge's assumption in his charge as to the proper interpretation of the evidence on speed, for he left it to the jury to say whether a speed at the crossing of from 50 to 60 miles was excessive. A speed of from 50 to 60 miles an hour at an ordinary crossing has not been held excessive. Moreover, even if we assume that there was some evidence of such a rate, it certainly was disputed and the defendant was entitled to the charge which it requested: "That a rate of speed of even forty to fifty miles over the crossing in question would not be any negligence." The denial of this request was error.

█ In any event, contributory negligence of the plaintiff was a bar to his recovery. He was not justified in coming on this long crossing without looking again for an approaching train. Our decision in Kinghorn v. Pennsylvania R. Co., 47 F.(2d) 588, is no help to him. Here, according to the testimony of his witness, he was in motion while attempting to cross the track for a period from 15 to 25 seconds during which he did not look. In the Kinghorn Case the period was only 8

seconds. In the latter case, moreover, the plaintiff was at a point but four feet from the tracks when he started to cross and only failed to look again before starting at that point and actually crossing. Under the rule laid down in Baltimore & O. R. R. v. Goodman, 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645, Bassett was clearly negligent in not looking at all after he started the second time. See, also, Leiby v. Penn. R. Co. (C. C. A.) 58 F.(2d) 970. The Vermont authorities are plainly in accord. Goodwin v. Gaston et al., Rec'rs, 103 Vt. 357, 154 A. 772; Harrington v. Rutland Railroad Co., 89 Vt. 112, 94 A. 431; Shumm's Adm'x v. Rutland Railroad Co., 81 Vt. 186, 69 A. 945, 19 L. R. A. (N. S.) 973. The decisions of the state courts as to what constitutes contributory negligence have been held controlling. Boston & M. R. R. v. Daniel (C. C. A. 2) 290 F. 916, at page 932; Roberts v. Tennessee Coal, Iron & R. Co. (C. C. A. 5) 255 F. 469, at page 473; Milford & U. St. Ry. Co. v. Cline (C. C. A. 1) 150 F. 325.

It is claimed that the plaintiff was so engrossed in getting over the rough planking that he was justified in not looking within the 20 feet which he traversed very slowly before he reached the tracks, and also in going the whole remaining distance without looking. The fact that his load narrowed the field of vision at the place where he was sitting made it all the more important for him to obtain an extended view frequently. He took a very long and slow way to cross and adopted no adequate precautions to protect himself while crossing.

It is argued that our decision in Bohenik v. Delaware & Hudson Co., 49 F.(2d) 722, requires us to direct final judgment for the defendant, but we can discover no resemblance between that case and this. In Hoffman v. American Mills Co. (C. C. A. 2) 288 F. 768, a motion was made to dismiss the complaint; upon which the trial court reserved decision, while taking a verdict, which proved to be for the plaintiff. Thereafter, the court dismissed the complaint, but allowed the verdict to stand, so that a judgment might be entered in accordance with the verdict, if the appellate court should hold that the disposition of the case by the court below was erroneous. On appeal we held that the complaint was erroneously dismissed and we reversed the judgment and directed the entry of a judgment for the plaintiff on the verdict. In the case at bar there is no verdict to support a judgment for the defendant because the special verdict that the speed was negligent stands in the way. To enter judgment for the defendant we should have to set it

aside and re-examine the facts tried by the jury. To do this would violate the rule laid down in Slocum v. New York Life Ins. Co., 228 U. S. 364, 33 S. Ct. 523, 57 L. Ed. 879, Ann. Cas. 1914D, 1029. A new trial must, therefore, be granted.

Judgment reversed, and a new trial ordered.