Coos,
Dec. 6, 1904.

REYNOLDS, *Adm'x, v.* BURGESS SULPHITE FIBRE CO.

A nonsuit is properly ordered in an action for personal injuries when the causal connection between the alleged negligence and the injury complained of is upon the plaintiff's evidence left wholly to conjecture, and when the facts proved are consistent with two or more equally probable theories leading to different legal results.

CASE, for personal injuries. Trial by jury and verdict for the plaintiff. The defendants' motion for a nonsuit was denied, and they excepted. Transferred from the November term, 1902, of the superior court by *Young,* J.

*Crawford D. Hening* (of Pennsylvania) and *Henry F. Hollis*, for the plaintiff.

*Orville D. Baker* (of Maine) and *George F. Rich*, for the defendants.

WALKER, J.   On the afternoon of April 9, 1899, the plaintiff's intestate, Reynolds, was killed in the defendant's engine room.   Reynolds was an assistant engineer whose duty it was to assist the principal engineer, Rankin, in operating several of the defendant's engines.   He had been at work in this capacity for about twenty days, and had had considerable experience as a locomotive engineer.   He was regarded as a competent man for the work.   On the day of the accident, a few minutes before six o'clock, he was found lying on the floor, with his head between the governor wheel of an engine and the crank case, and his body extended into the room at an angle of about forty-five degrees with the side of the engine.   His feet were nearly opposite the manholes, which opened into the crank case.   There was a severe wound upon the left side of his head, and blood upon the inside rim of the governor wheel and on one of the governor weights.   He died in a minute or two after he was found.   No one saw him at the time he received his fatal injury; but it is plainly evident from the testimony that the immediate cause of his death was a blow on the head from a revolving governor weight.

The engine in question was a Westinghouse, single-acting, compound engine.   It was used to furnish power in connection with, or auxiliary to, a water-power.   The two powers were thus utilized by means of a rigid coupling which could not be readily disconnected.   A friction clutch is sometimes used for this purpose, which allows the engineer to instantly disconnect the water power whenever there is occasion to do so.   It was claimed that the defendant was negligent in connecting the water power with the steam power by a rigid coupling.   The mechanism of the engine was such that when the water power was used there was a liability that it would "drag" the engine; that is, if the water power exceeded the power produced by the engine, the effect would be to weaken the high-pressure connecting rod and strap, which were not intended to sustain power applied in both directions, as in the case of a double-acting engine.

A few minutes before the accident, Reynolds and Rankin started up the engine, the water power and steam power being applied at the same time.   After the machinery got about up to speed, an unusual pounding was heard inside the crank case, and after two or three minutes there was a crash resembling the break-

ing of iron. There was evidence that when the engine was pounding, but before the final crash, Reynolds was standing back of the engine near the governor wheel, engaged in conversation with a fellow-workman, named Mitchell. They heard two extra-loud knocks, when Mitchell at the request of Rankin hastened away to have the water-wheels shut off. Rankin, whose position at the throttle prevented him from seeing Reynolds, turned off the steam about the time the crash occurred; and very soon thereafter he went behind the engine and found Reynolds in the position above described. The two manhole covers were forced out and the casing was broken, though the broken parts were not thrown into the room. The high-pressure connecting rod and strap were broken and had fallen into the crank case. This rod when in position was opposite the left-hand manhole. If a different coupling had been used, the breaking of the strap might have been avoided. The governor weight at its highest point was about four and one half feet above the floor and about two feet back from the foundation of the engine. It projects a little beyond the rim of the wheel in its revolutions. In leaving the room from the back of the engine one would naturally go out by the governor wheel. There was ample room for this purpose back of the engine, and the space was well lighted. There was evidence that there was oil on Reynolds' trousers and on the floor after the accident. It also appeared that there was oil and water in the crank case, which extended up to within two inches of the bottom of the manholes.

Upon these evidentiary facts, the plaintiff claims that the jury were warranted in finding that the defendant's alleged negligence in maintaining the rigid coupling was the proximate cause of Reynolds' death. There was evidence that such a method of connecting auxiliary steam power with water power as was adopted by the defendant was improper and dangerous, in that it was liable to " drag " the engine and create a strain upon the strap which it was not intended to sustain, and that the breaking of the internal parts of the engine, at the time of the accident, may have been due to this cause. If these deductions are sound, it was still necessary for the plaintiff to show by competent evidence a causal connection between the negligence of the defendant and the injury sustained by the deceased.

The defendant's alleged negligence may have caused, or resulted in, the breaking of the strap and the consequent destruction of the internal mechanism of the engine. This may be conceded. But the further vital question remains: Was that negligence the cause also of Reynolds' death? The solution of this question rests almost entirely upon circumstantial evidence. No one saw

him when he received the fatal blow. It is apparent, however that in some way his head came in contact with the revolving governor weight, the impact of which was the immediate cause of his death. This fact is not open to serious doubt. But how he happened to get into the somewhat peculiar position he must have been in, when his head was struck by the governor weight, is, upon the evidence, a matter of speculation and doubt. Was it a natural result of the defendant's negligence? Were the jury justified in finding it was due to that cause?

The plaintiff's theory is that Reynolds was standing back of the engine when the final crash occurred and the manhole covers were forced out, that he was startled by the noise caused by the breaking of the machinery, and that while seeking to escape from the apparent danger of his position he fell under the governor weight. It is claimed that the defendant's negligence caused the breaking of the machinery and the loud noise, which naturally caused Reynolds to be frightened and to seek to escape in accordance with the principle of the instinct of self-preservation (*Huntress* v. *Railroad*, 66 N. H. 185), when in his excitement he was fatally injured. Upon this theory, it was essential for the plaintiff to show that the deceased was standing back of the engine and near the manholes when the engine collapsed; in other words, that he was unharmed up to that time. For this purpose she relies upon evidence, which is very meager and indefinite, that there was oil upon his clothing, which, it is claimed, must have come from the interior of the crank case through the uncovered manholes at the time the covers were forced off; and this must have been at the time of the crash. It may be admitted that if he was standing in front of the manholes when the covers came off, and heard the loud noise made by the breaking of the inside mechanism, he would have been startled, and in his frantic attempt to escape he might have fallen under the governor wheel. But this reasoning is all based upon the fact that the oil was found upon his clothing after the accident, while he lay in front of the manholes. The witness Rankin thinks he found oil on Reynolds' trousers. That was his impression at the trial. But he could not say whether there was oil under him when he was found, nor did he pay much attention to the surroundings. The witness Mitchell says there was some oil on the floor, but he did not know whether there was any water; he supposes there was. This is all the evidence there is in regard to the oil on Reynolds' clothing. Why it is so brief and inconclusive does not appear. There was no evidence as to the quantity of oil found upon him, whether little or much; whether many spots, few, or only one. Nor could any inference be drawn as to where upon his person the oil was found,

except that it was upon his trousers. It would be natural to suppose that water as well as oil would also have been seen on his clothing; but upon this the evidence is silent. Nor does it appear what the condition of his clothing was before the accident with reference to its being soiled with oil. Indeed, as to these matters the witnesses were not interrogated.

But assuming that the evidence was sufficient to warrant the inference that the oil found upon him came from the crank case through the open manholes, the simple fact that it was on his clothing has no more tendency to show that it came upon him before he was struck by the governor weight, than it does that it fell upon him while stretched upon the floor. As it is conceded that his body was extended from the wheel toward or in front of the manholes, it is just as probable that the oil was thrown upon him after he fell; that is, if he was knocked on to the floor before the final crash, the oil afterward thrown out through the manholes when the covers came off would fall upon him lying in that position, the same as it would if he had been standing erect in front of the crank case. The fact that there was oil upon him, which came from the crank case, has no tendency to prove whether it was thrown upon him before, at the time, or after he was hurled to the floor. If there had been oil and water under him, that fact might have had some tendency to show that he fell about the time the covers came of. So far as the evidence shows, there was no oil under him. It was merely upon his clothing and on the floor. The attempt, therefore, to prove the exact time when the accident happened fails, unless guessing is to be substituted for legal proof. To say that it happened when the mechanism of the engine broke and forced out the covers, rather than a moment or two before, is the merest speculation.

Suppose when Mitchell left him standing in front of the governor wheel, he at once began to examine the machinery to discover the cause of the commotion,—an operation that was strictly in the line of his duty as an engineer,—and he had in some way received the fatal blow from the governor weight, which prostrated him upon the floor in the position he was found to occupy: it is plain that oil subsequently forced out of the crank case would naturally fall upon that part of his person lying in front of the manholes; that is, upon his trousers. How, then, can it be said that the mere presence of oil upon his trousers, without other qualification or explanation, legally authorizes the inference that he was unhurt up to the time when the manhole covers fell off and the oil escaped?

In reaching their verdict upon the evidence, it is absolutely certain the jury inferred either (1) that immediately after Mitch-

ell left him Reynolds was frightened and in his frenzy was struck by the governor weight, and while lying upon the floor the manhole covers fell off and the oil was thrown upon him, or (2) that he was unharmed when the covers fell off and the oil got upon his clothing, and while seeking to escape he received the fatal blow. As to the first alternative, it is sufficient to say that there was no evidence that he was in fact frightened and lost his self-control, or that men in general in his situation at that time would have been frightened, or apprehended immediate personal injury. The doctrine of the instinct of self-preservation cannot be invoked to supply the place of positive or direct evidence, when immediate danger is not seen to be impending. The danger he then encountered may have been one of the assumed risks of his employment. The other alternative is based upon his fright occasioned by the breaking of the machinery, which might have indicated immediate peril to him and from which he sought to escape. But this hypothesis is no more probable than the other, since the existence of the oil on his clothing is at least as consistent with the former as with the latter theory.

Briefly and logically stated, the plaintiff's argument takes this form: (1) Oil from the crank case was found upon Reynolds' trousers; (2) the oil could only have been thrown out when the crash came; (3) therefore he was hurt when the crash came. The fallacy is shown by the fact that the oil might have been thrown upon him after he fell on to the floor and before the crash; hence his hurt and the crash are not proved to be simultaneous. They may have been; they may not have been. The fact is only susceptible of pure conjecture—not of logical or reasonable inference sufficient to sustain the burden of proof, according to the doctrine of *Deschenes* v. *Railroad*, 69 N. H. 285.

It is plain that there was ample time after Mitchell went away and before the strap broke, which it is claimed produced the dangerous situation, for the accident to happen. It is practically conceded in argument for the plaintiff, that if it had not been for the oil upon his trousers a jury would not be warranted in finding that he was struck by the governor weight at the time of the crash, rather than before. He might have been struck at that time, and he might not. The evidence furnishes no legal or logical means for ascertaining the fact, which upon the plaintiff's theory is indispensably important.

Since in this state the jury are not permitted to find material facts without evidence, or from mere conjecture as to the truth of one of two or more equally probable or possible theories having different legal results (*Deschenes* v. *Railroad*, *supra*; *Carr* v. *Electric Co.*, 70 N. H. 308, 310; *Gahagan* v. *Railroad*, 70 N. H. 441,

444; *Horan* v. *Byrnes*, 70 N. H. 531, 533; *Dame* v. *Car Works*, 71 N. H. 407, 408; *Cohn* v. *Saidel*, 71 N. H. 558, 568, 569; *Stevens* v. *Stevens*, 72 N. H. 360, 363), the defendant's motion for a nonsuit should have been granted.

*Exception sustained : verdict set aside : judgment for the defendant.*

YOUNG, J., did not sit: the others concurred.