Coös,
Feb. 4, 1919.

ANNIE INGERSON, *Adm'x*, v. GRAND TRUNK RAILWAY.

To charge a railroad with the duty of taking proper care of a drunken passenger who is incapable of caring for himself the railroad must know of such incapacity and proof that it ought to have known such condition or could have learned of it by care is insufficient to establish such duty.

A *scintilla* of evidence will not justify the submission of a case to the jury; there must be evidence from which they might reasonably and properly find the fact in issue.

Whether a verdict should be set aside as against the weight of the evidence is for the decision of the trial court, but such decision will be set aside when it could not reasonably be made and is the result of a plain mistake.

CASE, for negligently causing the death of the plaintiff's intestate by ejecting him at an improper place from defendants' passenger train. Trial by jury and verdict for the plaintiff. The defendants' motions for a nonsuit and directed verdict were denied subject to exception.

About noon on the 23d day of March, 1917, the body of the plaintiff's intestate, Benjamin Ingerson, was observed lying in the snow on the right of way of the defendant railroad about 36 feet from the nearest rail at a point some seven miles west of Groveton and a short distance south of the crossing of the tracks of the Grand Trunk and Maine Central Railroads. The place is known as the Diamond, but the Grand Trunk does not maintain any facilities for the discharge or reception of passengers there; though, as all trains stop before making the crossing, passengers sometimes take advantage of the stop to enter or leave trains. There is a small building near the crossing for the use of employees operating the signals controlling the passage of trains. From this signal or semaphore, near which the engines of trains usually stopped, to the point where the body was

found was 164 feet. Ingerson on the afternoon and evening of March 22 was at Groveton intoxicated, intending to take a train for Beatties', a flag station about one mile beyond the Diamond. He was seen to enter the smoking car of a train which left at 9:33 P. M., stopped at Stratford, the Diamond and at Beatties'. A freight train, which was on the siding at Groveton when the passenger train passed, left, going in the same direction, thirty minutes later and another left at 12:20 A. M. The landing platform at Stratford and Beatties' is on the right hand side of the track going north.

About three hours after the body was first seen it was removed and prepared for burial. There was a three-cornered cut on one temple and scratches on the back of one hand. Neither the physician who was present when the body was removed nor the undertaker who prepared it for burial testified. The plaintiff testified that the burial certificate states, as the cause of death, internal injuries. There was no other evidence of the cause of death except Ingerson's intoxication and the temperature of the night which was described as very cold.

Ingerson wore a brown sweater, light-colored trousers, rubber shoes and thick cap. His cap and a pint bottle nearly filled with liquor were found on the same side of the track about a quarter of a mile farther south toward Groveton. Two witnesses testified to seeing a man dressed as a woodsman standing in the passenger coach talking and laughing in a drunken way, who at the suggestion of the trainmen and with their assistance at some stop between Groveton and North Stratford left the car, going forward toward the smoking car immediately ahead; one witness stating that after going through the car door they turned toward the left. Men dressed as lumbermen frequently traveled on this train, were not infrequently intoxicated and in that condition always traveled in the smoking car and, if in the other car, would be removed to the smoker. A witness who lived in the only house near the crossing testified to hearing, at ten minutes before three in the morning, outcries as though two men were fighting. Other facts appear in the opinion. Transferred by *Sawyer*, J., from the December term, 1917, of the superior court.

*Sullivan & Daley, Ira W. Thayer* and *Edgar M. Bowker* (*Mr. Sullivan* orally), for the plaintiff.

*Harry P. Sweetser* (of Maine) and *George F. Rich* (*Mr. Rich* orally), for the defendants.

PARSONS, C. J.  Two facts clearly appear from the evidence, the finding of Ingerson's dead body on the defendants' right of way and his intoxication at Groveton the preceding afternoon.  All else is left by the evidence to doubt and conjecture.  The plaintiff claims Ingerson was a passenger and was ejected from the train at an improper place.  There is no claim that the ejection was for non-payment of fare, which would render the defendants liable for the resultant injury under the statute.  P. S., *c.* 160, *s.* 6; *Baldwin* v. *Railway*, 64 N. H. 596.  Neither is there evidence from which it could be found that the employees of the railroad removed him from the train because of his disorderly conduct.  If it be assumed that the man dressed as a lumberman who was standing in the passenger coach talking and laughing like a drunken man was Ingerson, there was no evidence that his conduct was such that it was probable the railroad employees would attempt to remove him from the train because of it.  Lumbermen or woodsmen frequently were on the train, not infrequently more or less intoxicated.  They rode in the smoker.  Removal to the smoker of one who was disturbing those in the passenger coach was usual and reasonably to be expected, but in view of the character of the usual traffic it could not reasonably be found that the trainmen were ejecting from the train for disorderly conduct a woodsman who was merely laughing and talking and "having a good time" as the witness described it.

The only evidence claimed to connect Ingerson in any way with the trainmen for whose negligence recovery is sought comes from two witnesses.  While these witnesses do testify to the trainmen's putting the drunken man they saw off the train, an examination of their testimony shows that these statements are conclusions of their own, not a report of what took place.  They were both seated at the rear of the coach and did not hear what was said by the trainman or men.  One says the conductor and brakeman took part, the other, only the conductor.  Leaving out the inferences, which the witnesses attempt to draw, their story is that one or both trainmen spoke to the drunken man and then the party of two or three went forward out of the car and they saw him no more.  One witness does say that after going through the car door they turned toward the left.  From this it is argued the stop at which the transaction took place was not Stratford or Beatties' where the passenger platform was on the right but was at the Diamond where there was no platform.  This witness did not hear of Ingerson's death which occurred in March until the following July.  He was seated in the rear of the car.  It was 10 P. M.

in March, when the interior of the car was lighted, and there were no lights without. He did not see the man alight upon the ground. If in this situation his testimony that the men turned to the left after going through the car door is some evidence, that is, has some logical tendency to prove that the man he saw left the train at the Diamond with the assistance of the defendants' employees it is not evidence upon which the jury could reasonably conclude the fact was proved. A *scintilla* of evidence will not justify leaving the case to the jury. There must be evidence from which they might reasonably and properly find the fact in issue proved. *Ryder* v. *Wombwell*, L. R. 4 Ex. 32, 39; *Paine* v. *Railway*, 58 N. H. 611, 614. The question whether the drunken man whom the witnesses saw in the passenger coach was Ingerson, whom the only evidence tending to show he was a passenger on the train places in the smoking car, presents the same difficulty. They identify him only as intoxicated and dressed as a woodsman. Men answering this description were frequent travelers on the railroad. That this man was Ingerson is, on the evidence, mere conjecture.

It is argued that the finding of Ingerson's body near the Diamond is evidence that he was a passenger on the train and left it at that point and was the man whom the witnesses saw. In *Currier* v. *Railroad*, 78 N. H. 586, the presence of the deceased Currier at the North Station in Boston shortly before the leaving of a train for Nashua and the finding of his body on the tracks in the railroad yard at Nashua immediately after the arrival of the train there, was evidence that he was a passenger on the train. The change of location could be accounted for in no other way. The evidence of Ingerson's presence at Groveton at 9:30 P. M. and the discovery of his body seven miles farther north at noon the next day does not establish the transportation was effected by the train leaving at 9:33 P. M. One undisputed fact shows that the place where his body was found had no connection with the place where he left a train. His cap and a bottle partly filled with liquor were found on the same side of the track a quarter of a mile farther south. There was evidence Ingerson gave his wife five dollars while at Groveton the day before and had been spending money in the purchase of liquor, but there was no evidence that he had money for the payment of his fare or that any money was found on his person after his death. Whether discovering his lack of cash he attempted to obtain transportation on a freight from which he alighted near where his cap and bottle were found, or landing at Beatties' or the Diamond he wandered to this place, sub-

sequently returning to the place where his body was found, are matters of speculation and conjecture about which the jury might guess but which cannot be determined by the comparative weight of competent evidence.

It is urged that Ingerson, unable to care for himself, was the defendants' passenger and was permitted at least to leave the train at a place at which in his condition he was likely to suffer injury. The defendants' contract, if he was a passenger, was to carry him safely to his destination and they were bound to the exercise of care in so doing. If they accepted him as a passenger knowing his incapacity to care for himself, that fact is an element to be considered in determining the care they were bound to exercise. *Wheeler* v. *Railway*, 70 N. H. 607. But there was no evidence of the sale of a ticket to Ingerson or that any of the employees saw him enter the train. Ingerson, not the railroad, was responsible for his condition. If, as the evidence indicates, it was negligence to attempt to return to his place of employment that night, the negligence was his own. To charge the railroad with greater care in his case it must appear the defendants knew his condition, not merely that they ought to have known it or could have learned it by care. On this issue there was no sufficient evidence. While it is clear that if they observed him the trainmen might have discovered his intoxication, there is no evidence that they knew or must have learned he was incapable of caring for himself, or that he was, in fact, incapable at any time disclosed by the evidence. At Groveton, though intoxicated to the eyes of his friends and the saloonkeeper, presumably an expert judge of such conditions, he was conducting his own affairs, going to the station by himself, returning with the report of the lateness of the train and apparently entirely capable, although a little unsteady on his legs. Between the action of trainmen in permitting a passenger to leave the train on arrival at his destination and compelling him to leave at some place chosen by themselves there is a wide distinction. In the one case they have completed the contract of transportation and performed the duties imposed thereby. In the other they create a new situation and are bound to care that no harm come to others by the action taken by them. *Adams* v. *Railroad*, 156 Ia. 31; *Pittsfield Co.* v. *Company*, 71 N. H. 522; *Buch* v. *Company*, 69 N. H. 257.

If the trainmen find a passenger intoxicated they are authorized to remove him to the baggage car and there detain him until he arrives at his destination. Laws 1907, c. 124, s. 1. They may, but are not

required, to place him in the custody of an officer. *Ib.* They could not be charged with negligence in permitting him to depart upon reaching his destination by train in the absence of evidence of their knowledge of his ultimate destination and means of reaching it. Whether the trainmen in this case had any knowledge on the subject is not shown, and, whether such knowledge with the other facts in the case would sustain a finding of negligence is not considered.

All material questions, as before stated, except the facts of death and intoxication are left by the evidence to guess and conjecture. By such means juries are not permitted to determine the rights of litigants. *Deschenes* v. *Railroad,* 69 N. H. 285; *Gahagan* v. *Railroad,* 70 N. H. 441; *Dame* v. *Laconia &c. Works,* 71 N. H. 407; *Reynolds* v. *Company,* 73 N. H. 126.

If the evidence can be thought to have some logical tendency to support the issues, it is of so slight weight that a verdict for the plaintiff should be set aside as against the weight of the evidence. This is a question of fact for the trial court which has been decided adversely to the defendants. But such a decision presents the question whether it could reasonably be made and may be set aside when it is apparent the trier of fact unwittingly fell into a plain mistake. *St. Laurent* v. *Railway,* 77 N. H. 460, 462; *State* v. *Wren,* 77 N. H. 361, 367; *Twombly* v. *Lord,* 74 N. H. 211, 212. Such is plainly the case here; and, if the verdict were otherwise without error, it would be set aside as against the weight of the evidence. The motion to direct a verdict should, however, have been granted.

*Exceptions sustained: verdict and judgment for the defendants.*

All concurred.