Merrimack,
Jan. 6, 1931.

JOHN COZZI, *by his next friend, v.* HOOKSETT.

VINCENT COZZI *v.* SAME.

SYLVIA COZZI *v.* SAME.

*Murchie, Murchie & Blandin* (*Mr. Alexander Murchie* orally), for the plaintiffs.

*Thorp & Branch* (*Mr. Branch* orally), for the defendant.

MARBLE, J.   Prior to the passage of Laws 1925, *c.* 52, the liability of towns for injuries caused to travelers by the defective railing of dangerous highway embankments was determined by the common-law rule of reasonableness.   *Ahern* v. *Concord*, 82 N. H. 246, 248; *Prichard* v. *Boscawen*, 78 N. H. 131, 133; *Seeton* v. *Dunbarton*, 72 N. H. 269, and cases cited.

Although the statute of highways had its inception in the days of horse-drawn vehicles, its provisions were held to embrace new methods of travel (*Hendry* v. *North Hampton*, 72 N. H. 351, 356) including the automobile (*Richmond* v. *Bethlehem*, 79 N. H. 78, 81).   And since the essential inquiry in all cases was what the average prudent person charged with a like duty would have done under similar conditions, it was conceivable that juries might properly deem some embankments so dangerous as to require the erection of a barrier strong enough to prevent a motor-car from leaving the road.   *Kelsea* v. *Stratford*, 80 N. H. 148, 152.

As motor traffic became more general, state appropriations for road-building rapidly increased, and the duty of locating, constructing and maintaining the more important highways of the state eventually devolved upon the state highway department.   P. L., *c.* 83.   Laws 1903, *c.* 54, *s.* 6 exempted towns altogether from liability on account of roads made or repaired in whole or in part by the state.   *Grace* v. *Belmont*, 78 N. H. 112.   But even though towns had, as a practical matter, little supervision or control over the building or repair of

state-aided roads within their territorial borders (their rights in that regard being limited to an appeal to the governor and council from the decisions of the highway commissioner, P. L., c. 83, s. 12), the liability removed in 1903 was partially restored by Laws 1915, c. 48, s. 2, which provided that towns should be liable, in accordance with the terms of the statute, for injuries occasioned to travelers on such state-aided roads, except for the period during which state work was in progress and thirty days thereafter. P. L., c. 89, s. 4; *Kelsea* v. *Stratford*, 79 N. H. 273.

It was doubtless a recognition of this anomalous situation and the hardship likely to result to municipalities therefrom that prompted the legislature in 1925 to modify the towns' liability, so far as embankment railings were concerned, by substituting for the common-law standard of reasonable construction a fixed mechanical standard, sufficient whatever the circumstances of the particular case. In other words: "A new rule of conduct was set up, differing from the common law" (*Carleton* v. *Railroad*, 82 N. H. 263, 266), and permitting towns "to exercise for protection from liability a degree of care less to some extent than that which had been required as the law had been administered" (*Colston* v. *Railroad*, 78 N. H. 284, 286).

The language of the old statute declaring that towns were liable for damage caused by the insufficiency of culverts, sluiceways, bridges, and embankment railings, though retained in the new act, was followed by this important proviso: "Dangerous embankments shall be held to be sufficiently railed whenever the railing erected is the standard rail erected by the state highway department, or by a town, and the railing has been approved by the state highway department." Laws 1925, c. 52, s. 2.

When this section was later embodied in P. L., c. 89, s. 2, the comma following the word "town" was omitted, but this omission does not evince an intention to change the meaning of the provision by declaring that a non-standard rail shall be sufficient when approved by the highway department. This was the purport of the amendment as originally introduced; but the bill (House Bill No. 3) was not adopted in its original form. The provision in first draft was thus worded: "*Provided, however*, that the standard rail erected by the State upon highways or upon state aided highways shall be held to be a sufficient railing, and provided further that all railings erected by towns which shall be approved by the state highway commissioner shall be held to be a sufficient railing."

It would therefore appear that the railing specified by the state

highway department as standard is the requisite maximum safeguard for all dangerous embankments whether erected by the state or by a town. Approval by the department merely serves an evidentiary purpose for the town's protection. This is indicated by section 3, which provides for the examination of railings at a town's request, the record of the department's approval of the railings "as standard railings" (the words "as a sufficient railing" appear in the original draft), and the use of certified copies of the record in judicial proceedings.

Since a town fulfils its entire legal duty by maintaining the standard rail, it follows that this rail is the measure by which a town's responsibility is to be tested. If, then, in a case involving injury to a traveler by the breaking of a non-standard rail, the plaintiff fails to sustain the burden of proving that standard construction would have prevented the accident, he cannot recover. See *Collette* v. *Railroad*, 83 N. H. 210; *Morier* v. *Hines*, 81 N. H. 48, 57.

At common law towns were under no liability whatever to travelers for injuries caused by defective highways. *Sargent* v. *Gilford*, 66 N. H. 543; *Hickey* v. *Berlin*, 78 N. H. 69. But chapter 57 of the Revised Statutes (1842) imposed upon them a somewhat limited liability for "the obstructions, insufficiency or want of repair of any highway or bridge." This statute was many times reënacted, but without radical amendment down to 1893. C. S., c. 61; G. S., c. 69; G. L., c. 75; P. S., c. 76.

"The act of 1893 was a change of policy as to municipal liability for default in highway maintenance. It was intended to relieve towns to a large extent from such liability." *Robertson* v. *Monroe*, 79 N. H. 336, 341. No right of action was given except to one injured while "using the parts of the highway enumerated in the section, namely, a bridge, culvert, sluiceway, or embankment" defectively railed (*Wilder* v. *Concord*, 72 N. H. 259, 261), nor for any defect which was not a part of these particular structures (*Bernier* v. *Whitefield*, 80 N. H. 245). Chapter 48 of the Laws of 1915 and chapter 52 of the Laws of 1925 very clearly indicate a continuance of this policy.

Significantly, the act of 1925 does not impose upon towns an imperative duty to erect standard railings. On the contrary, it places still another restriction on the towns' liability by providing in express terms that standard construction is sufficient construction. The language of this provision, read in the light of the history and policy of the earlier legislation on the subject (*Stanyan* v. *Peterborough*, 69 N. H. 372, 373; *Clough* v. *Clough*, 80 N. H. 462, 464; *Mulhall* v. *Com-*

534

*pany*, 80 N. H. 194, 196, and cases cited), demands the interpretation we have given it.

The act, though applicable, was not invoked in *Clark* v. *Hampton*, 83 N. H. 524, or in *Hall* v. *Wentworth's Location*, *ante*, 236. The presiding justice in *Clark* v. *Hampton* instructed the jury, without objection, that the simple question for them to determine was "whether the average reasonably prudent man would have erected a railing to make this road reasonably suitable and sufficient for the travel thereon." 397 Briefs and Cases, 309, 385. Similar instructions were given in the *Hall* case, but no error was claimed except on the ground that the amendment to the declaration was not properly allowed. Briefs and Cases, No. 2320.

During the summer of 1927, the fence at the point where the accident to the present plaintiffs occurred had been repaired by a state highway patrolman. In making the repairs the patrolman had selected posts from a supply which had been left by the contractor who had rebuilt the road, under a contract with the state, some years before. Among the material requirements of the standard fencing adopted by the state highway department are sound posts, six inches in diameter and six feet in length, set three feet in the ground and spaced eight feet apart; and rails, six inches wide, two inches thick and sixteen feet long. There are also specifications for painting, and for coating the lower portion of the posts with creosote oil.

The defendant concedes that the fence through which the plaintiffs' car was precipitated did not conform to all these requirements. The sole question to be decided, therefore, is whether there is evidence from which it could be found that a standard railing, if erected, would have prevented the accident.

There is no evidence relating to the strength of a fence of standard specifications, and it cannot be said that jurors possess any very definite information on the subject. It is common knowledge that automobiles when out of control often demolish substantial structures which impede their progress. Furthermore, no witness professed to estimate the force with which the plaintiffs' car struck the railing. Certainly the impact could not, as in *Clark* v. *Hampton*, 83 N. H. 524, 527, be described as merely of a "glancing nature."

The car was skidding on an icy hill. A witness who observed the accident stated that the speed of the car was about fifteen miles an hour when it "hit the ice"; that the back end of the car swerved to the left and that the car then "turned clear around and went through the fence," and that the left rear wheel "struck the fence first." The

local chief of police testified that immediately after the accident he saw a mark apparently made by the rear wheel, as though the car "had gone sideways and the rim had scraped the ice," extending from an elm tree down to the fence, a distance of ninety-four feet.

Vincent Cozzi, the operator of the car, testified that he was driving about twenty-five or thirty miles an hour when he came to the top of the hill, but that he knew there was ice near the foot of the hill and "slowed down" to fifteen miles an hour before reaching it; that the car was about three car-lengths from the fence when it began to skid. He said: "I put my foot on the brake and put out my clutch and it started to skid and I couldn't do nothing with her, she skidded in all directions, and finally I was close to the fence, I don't know which way I struck it, I think I struck it on the right hand side or left, I really don't know, I know I heard a crash and down I went through . . . I had the brake on all the way down, at times I put out the clutch, and I tried to push the brake harder to prevent it from going down but I was almost helpless. I could do nothing; there was nothing I could do to hold it."

And on cross-examination: "Q. When you started to skid did you have the brake on? A. Yes. Q. Did you keep it on all the time until you went over the bank? A. Kept it on just lightly and tried to put the clutch out . . . Q. And did you have your clutch out during the time you were skidding? A. Yes, two or three different times."

No argument is necessary to demonstrate that this evidence, taken in connection with the absence of evidence already noted, falls far short of proving that the maintenance of a standard railing at the point where the accident occurred "would have probably saved serious consequences to the occupants of the car." *Clark* v. *Hampton*, 83 N. H. 524, 527. A finding to that effect would obviously be based upon sheer conjecture. And it is elementary that juries are not permitted to determine the rights of litigants in that way. *Ingerson* v. *Railway*, 79 N. H. 154, 159; *Russell* v. *Railroad*, 83 N. H. 246, 249, and cases cited.

The exceptions are therefore sustained. The order in each case is

*Judgment for the defendant.*

BRANCH, J., did not sit: the others concurred.

ON REHEARING. After the foregoing opinion was filed, the plain-

tiffs moved for a rehearing, and argument was invited on the scope of the motions for a nonsuit and directed verdict.

*Murchie, Murchie & Blandin (Mr. Alexander Murchie* orally), for the motion.

*Thorp & Branch (Mr. Branch* orally), opposed.

MARBLE, J. The plaintiffs contend that the decision is based upon an interpretation of the act of 1925 which was suggested for the first time in this court; that the defendant's right to insist upon a directed verdict is limited to the reasons stated in its motion (*Puchlopek* v. *Company*, 82 N. H. 440, 441; *State* v. *Isabelle*, 80 N. H. 191, 192, and cases cited), and that no reason there assigned can fairly be said to raise the question now held to be determinative of the case.

This makes it necessary to consider in detail the motions for a nonsuit and directed verdict.

The grounds on which a nonsuit was requested were:

"1. Because there is no evidence that the railing in question was not the standard rail erected by the state highway department or approved by it and that the embankment was not sufficiently railed under the statute.

"2. That there is no evidence that there was anything about the railing in question or relating to its condition to put the town upon inquiry prior to the accident.

"3. Because upon all the evidence in the case it conclusively appears that the proximate cause of the accident was the skidding of the plaintiff Cozzi's car upon the ice as it approached the scene of the accident which resulted in the car being out of control at the time that the accident occurred and such skidding was not due to any negligence on the part of the defendant.

"4. Because there is no evidence to show that reasonably prudent men under the circumstances would not have maintained such a railing at the place in question prior to the accident.

"5. Because there is no evidence of negligence on the part of the defendant."

At the close of all the evidence defendant's counsel made the following motion: "We move for a directed verdict, renewing the grounds stated in our motions for a nonsuit, and on the further ground that from the evidence it conclusively appears that the railing in question was erected by the State Highway Department and was the

standard railing, and that the embankment was sufficiently railed within the meaning of the statute."

The declaration in each case alleges that the highway at the place where the accident occurred was not "in suitable repair for the travel thereon" by reason of "a dangerous embankment, defectively railed." No reference is made in specific terms to the statute of 1925. But the defendant made clear its reliance upon the provisions of that statute as early in the trial as the cross-examination of the first witness.

Both court and counsel must have understood it to be the defendant's claim, as outlined in the motions, that there was no evidence of a violation of the act of 1925, but that even if the fence did not conform to the requirements of that act, the plaintiffs could not recover, since the skidding of the automobile was the proximate cause of the accident. From the declaration and the context of the motions they must also have understood the term "negligence" as used in the fifth ground of the motion for a nonsuit to mean actionable fault.

While it is true that if specific grounds for a nonsuit are assigned, general ones are waived (*St. Laurent* v. *Railway,* 77 N. H. 460, 463), here the specific grounds of the defendant's motion, when taken collectively, amount to an assertion that the plaintiffs have failed to establish a cause of action under the statute of highways as amended by the act of 1925. In such a situation it is difficult to see how the defendant can be held to have waived its right to argue in this court that the act of 1925 created a new standard by which the conduct of the town must be measured.

The plaintiffs now claim that they were "led into a trap" by the defendant's failure to advance this argument at the trial and so lost the opportunity to supply evidence of the strength of the standard fence.

This claim finds no support in the record. Apparently the plaintiffs would have deemed such evidence unnecessary even if the case had been tried on the correct theory. This is indicated by the following extract from the argument of plaintiffs' counsel to the jury: "You don't have to be going very fast on clear ice down hill to skid, and once you get going, you know just as well as anybody else and no expert testimony is necessary for that, that it is almost impossible to get your car under control until it hits something and straightens it out, and if that fence had been a reasonable fence there, even fence posts of that size, not the standard size, in fairly good condition, it would have been sufficient to hold Cozzi's car as it bumped there and he could have straightened out his car and gone right along."

The exception to this argument clearly signifies that the defendant was insisting then, as it later insisted in this court, that the strength of a railing of standard size and construction was not a matter of common knowledge but must be proved by evidence.

Later in his argument plaintiffs' counsel expressly disavowed any contention that the town was required to "build a fort" to withstand the impact of motor cars and again urged the jury to find that if the particular fence through which the plaintiffs' car was precipitated had been in proper repair, it would have prevented the accident. And he asked them to draw this conclusion despite the fact that no evidence relating to the strength of such a fence had been introduced.

It is therefore extremely unlikely that evidence of the strength of a standard fence would have been supplied even if the defendant had explicitly stated in its motion for a directed verdict that evidence on this point was lacking. At any rate it does not appear that the plaintiffs have been prejudiced as a matter of law. Whether they are entitled to relief on the ground of accident, mistake or misfortune is a question of fact for the superior court. *Watkins* v. *Railroad*, 80 N. H. 468; s. c. 81 N. H. 363.

*Former result affirmed.*

BRANCH, J., did not sit: the others concurred.