ROCKINGHAM, JUNE, 1890.

---

HUNTRESS *v.* BOSTON & MAINE RAILROAD.

In an action against a railway company by the administrator of a person killed by a train on a level highway crossing, when there is no evidence that the deceased was insane or intoxicated or that he committed suicide, and no direct evidence on the question of his negligence, his exercise of ordinary care may be inferred from the instinct of self-preservation.

Whether persons of ordinary prudence, operating a railroad with full knowledge of the dangers of such a crossing, would guard against accidents by stationing a flagman there or slackening the speed of the trains, is a question of fact.

| | |
|---|---|
| 66 | 185 |
| 66 | 202 |
| 66 | 185 |
| 68 | 252 |
| 66 | 185 |
| 69 | 291 |
| 66 | 185 |
| 70 | 443 |
| 70 | 446 |
| 70 | 447 |
| 70 | 451 |
| 66 | 185 |
| 71 | 364 |
| 66 | 185 |
| 72 | 39 |
| 72 | 374 |
| 66 | 185 |
| c74 | 129 |
| 74 | 132 |

CASE, by the administrator of Martha L. Huntress, the plaintiff's wife, who was killed at a grade crossing of the defendants' road. Verdict for the plaintiff. The questions raised by a motion for a nonsuit were reserved.

*Frink & Batchelder*, for the defendants. The deceased could have seen the train if she had looked. If she saw it she could have avoided collision by stopping her horse. In *Chicago, etc., Railroad v. Houston*, 95 U. S. 697, 702, the plaintiff's wife was walking across the track. "She was bound to listen and to look before attempting to cross the track, in order to avoid an approaching train, and not to walk carelessly into the place of possible danger. Had she used her senses, she could not have failed both to hear and to see the train which was coming. If she omitted to use them, and walked thoughtlessly upon the track, she was guilty of culpable negligence, and so far contributed to her injuries as to deprive her of any right to complain of others. If, using them, she saw the train coming, and yet undertook to cross the track instead of waiting for the train to pass, and was injured, the consequences of her mistake and temerity cannot be cast upon the defendant. No railroad company can be held for a failure of experiments of that kind. If one chooses, in such a position, to take risks, he must bear the

possible consequences of failure. . . . Not even a plausible pretext for the verdict can be suggested, unless we wander from the evidence into the region of conjecture and speculation. . . . The court would not have erred had it instructed the jury, as requested, to render a verdict for the defendant." Many of the decisions lay it down as an unqualified rule, applicable to all cases, that the traveller must stop to look and listen before attempting to cross the rails. All the authorities concur in holding that he must exercise at least the reasonable precaution of looking and listening. The cases in which his duty is stated are too numerous for citation. A few of them are sufficient. *Maryland, etc., Railroad* v. *Newburn,* 62 Md. 391; *Reading & Columbia Railroad* v. *Ritchie,* 102 Pa. St. 425; *Pierce* v. *Railroad,* 73 Iowa 140; *Allyn* v. *Railroad,* 105 Mass. 77; *Lesan* v. *Railroad,* 77 Me. 85; *Gaynor* v. *Railroad,* 100 Mass. 208; *Langhoff* v. *Railroad,* 23 Wis. 43; *Rothe* v. *Railroad,* 21 Wis. 256; *Delaney* v. *Railroad,* 33 Wis. 67; *Haas* v. *Railroad,* 41 Wis. 44; *Kearney* v. *Railroad,* 47 Wis. 144; *Steves* v. *Railroad,* 18 N. Y. 422; *Ernst* v. *Railroad,* 39 N. Y. 61; *Havens* v. *Railroad,* 41 N. Y. 296; *Harty* v. *Railroad,* 42 N. Y. 468; *Cordell* v. *Railroad,* 75 N. Y. 330; *Gorton* v. *Railroad,* 45 N. Y. 660; *Mitchell* v. *Railroad,* 64 N. Y. 655; *Salter* v. *Railroad,* 75 N. Y. 273; *Connelly* v. *Railroad,* 88 N. Y. 346; *Tolman* v. *Railroad,* 98 N. Y. 198; *Butterfield* v. *Railroad,* 10 Allen 532; *Hinckley* v. *Railroad,* 120 Mass. 257; *Wright* v. *Railroad,* 129 Mass. 440; *Chicago, etc., Railroad* v. *Bell,* 70 Ill. 102; *Chicago, etc., Railroad* v. *Damerell,* 81 Ill. 450; *Benton* v. *Railroad,* 42 Iowa 192; *Donaldson* v. *Railway,* 21 Minn. 293; *Brown* v. *Railway,* 22 Minn. 165; *Abbett* v. *Railway,* 30 Minn. 482; *Railroad Co.* v. *Coyle,* 55 Pa. St. 396; *No. Pennsylvania Railroad* v. *Heileman,* 49 Pa. St. 60; *Pittsburg, etc., Railroad* v. *Dunn,* 56 Pa. St. 280; *Pittsburg, etc., Railroad* v. *Pearson,* 72 Pa. St. 169; *Schofield* v. *Railway,* 114 U. S. 615; *Continental Imp. Co.* v. *Stead,* 95 U. S. 161; *Stubley* v. *Railway,* L. R. 1 Ex. 13; *Grippen* v. *Railroad,* 40 N. Y. 34; *Bacon* v. *Railroad,* 58 Md. 482; *Davey* v. *Railway,* L. R. 11 Q. B. D. 213.

The duty of trainmen is equally well settled. "There can be no doubt upon this evidence that after the engineer discovered that the child was in peril, he did all he could to arrest the motion of his train. That he wilfully or recklessly ran upon him after he discovered that he was in peril is inconceivable, and certainly cannot be assumed. An engineer is not bound to stop his train the moment he sees some living object upon the track. He has the right, in broad daylight, when his train is perfectly visible, and its approach must be heard and known, at least in the first instance, to assume that the object, whatever it is, will leave the track in time to escape injury. . . . Reasonable care in the management of trains which must make their time between stations, and have the right of way, does not require more." *Chrystal* v. *Railroad,* 105 N. Y. 164. If the engineer and fireman were negligent

in not discovering the horse and carriage in season to stop the train, the deceased must have been negligent in not discovering the train in season to stop the horse.

*J. W. Emery* and *S. W. Emery*, for the plaintiff.

Doe, C. J.   In the afternoon of May 19, 1887, the plaintiff's wife, M., in a carriage with her mother, on a highway crossed by the defendants' railroad at grade, attempted to cross the railroad in front of a train that was moving at a speed of from thirty-five to forty miles an hour.   There was no gate or flagman, but there were "warning signs," such as are required by Laws of 1885, *c.* 98, *ss.* 1, 2, 3.   The railroad was straight for a mile or more in the direction from which the train was coming.   On the highway where M. was driving, from the nearest rail to a point one hundred and ten feet from it, there was an unobstructed view of the railroad for a long distance.   At the whistling-post, eighty rods from the crossing, the whistles required by law were given, and the bell was rung constantly from the post to the crossing.   The horse was kind and gentle, and was driven upon the crossing without stopping.   The carriage was struck by the locomotive, and M. and her mother were killed.   The fireman, being engaged in putting coal in the firebox, did not see the horse and carriage until it was too late to slacken the speed of the train.   The engineer, at his post, looking ahead on the right side of the engine, did not see the horse and carriage approaching the track on the left side until notified by the fireman.   Assuming that there was no fault in the engineer or fireman, the question is whether it could properly be found that the collision was caused by want of due care on the part of the defendants, with no contributory want of due care on the part of M.

"If a railroad crosses a common road on the same level, those travelling on either have a legal right to pass over the point of crossing, and to require due care on the part of those travelling on the other, to avoid collision.   . . .   From the character and momentum of a railroad train, and the requirements of public travel by means thereof, it cannot be expected that it shall stop and give precedence to an approaching wagon to make the crossing first: it is the duty of the wagon to wait for the train.   The train has the preference and right of way.   But it is bound to give due warning of its approach, so that the wagon may stop and allow it to pass, and to use every exertion to stop if the wagon is inevitably in the way.   Such warning must be reasonable and timely.   But what is reasonable and timely warning may depend on many circumstances.   . . .   The speed of a train at a crossing should not be so great as to render unavailing the warning of its whistle and bell; and this caution is especially applicable when their sound is obstructed by winds and other noises, and when intervening

objects prevent those who are approaching the railroad from seeing a coming train. In such cases, if an unslackened speed is desirable, watchmen should be stationed at the crossing.

"On the other hand, those who are crossing a railroad track are bound to exercise ordinary care and diligence to ascertain whether a train is approaching. They have, indeed, the greatest incentives to caution, for their lives are in imminent danger if collision happen; and hence it will not be presumed, without evidence, that they do not exercise proper care in a particular case. But notwithstanding the hazard, the infirmity of the human mind in ordinary men is such that they often do manifest a degree of negligence and temerity entirely inconsistent with the care and prudence which is required of them,—such, namely, as an ordinarily prudent man would exercise under the circumstances. When such is the case, they cannot obtain reparation for their injuries, even though the railroad company be in fault. They are the authors of their own misfortune. . . . Conceding that the railway train has the right of precedence of crossing, the parties are still on equal terms as to the exercise of care and diligence. . . . The right of precedence . . . does not impose upon the wagon the whole duty of avoiding a collision. It is accompanied with, and conditioned upon, the duty of the train to give due and timely warning of approach. . . . Both parties are charged with the mutual duty of keeping a careful lookout for danger; and the degree of diligence to be exercised on either side is such as a prudent man would exercise under the circumstances of the case." *Continental Improvement Co.* v. *Stead*, 95 U. S. 161, 164, 165.

Many common facts and prevalent conditions, amounting to general rules, within the ordinary experience or observation of jurors, or capable of being ascertained by reasoning, may be adopted by them as grounds of decision in cases not shown to be exceptions to such rules. "The presumption of sanity, whether it be a presumption of law or of fact, is, in one sense, a substitute for evidence. The general presumption of sanity is sufficient *prima facie* evidence of that fact to warrant a finding of sanity where no evidence is introduced tending to show insanity." "If it be merely a presumption of fact, it is nevertheless a presumption drawn from the common experience of mankind, which the court were well warranted in calling the attention of the jury to; and it is a presumption which the jury would inevitably have made whether the court had referred to it or not." *State* v. *Pike*, 49 N. H. 399, 408, 444. "Natural presumptions are nothing else than deductions from general experience; and they therefore belong to the class of circumstantial evidence. They are founded in an assumption of the fact, from its consistency with known principles of human conduct; such as that a man . . . is aware of the natural consequences of his actions; with many others that are put as instances: to which I add the very natural presumption, that he is always

ready to take those measures which are obviously necessary to the protection of his property or interests. The presumption that he is endowed with a competent share of sagacity to perceive those measures, is a reasonable one; and, that he is so true to the instinct of his nature as to pursue them, being perceived, is as much so. These are premises from which a lawyer might argue and a jury draw a conclusion of the fact. As a general rule, then, it may be assumed that a man has sagacity to perceive, and energy to execute, every measure which the preservation of his property may dictate." *Gibson*, C. J., in *Snevely* v. *Jones*, 9 Watts 433, 435.

If the defendants' engineer and fireman had been killed by running the train against a load of logs which the plaintiff had negligently hauled on the crossing, actions brought against him by their administrators might be maintained without the direct testimony of a witness that the deceased used due care. It might be inferred that they made reasonable efforts to avoid a collision that would manifestly endanger their lives. The "exercise of due care may be inferred, under some circumstances, from the ordinary habits and dispositions of prudent men, and the instinct of self-preservation." Pierce R. R. 299, and cases there cited. "If a carriage be driven furiously upon a crowded thoroughfare, and a person is run over, he would not be obliged to prove that he was cautious and attentive, and he might recover though there were no witnesses of his actual conduct. The natural instinct of self-preservation would stand in the place of positive evidence. . . . The purpose of a jury trial is, that the experience, intelligence, and judgment of twelve men may be availed of to settle disputed questions of fact. The duty of the judge . . . is the same in this class of cases as in others: it is to determine whether a case is presented fit for the deliberation of the jury. This is to be decided . . . by considering the facts and circumstances in evidence, in connection with the ordinary habits, conduct, and motives of men. . . . The absence of any fault on the part of the plaintiff may be inferred from circumstances; and the disposition of men to take care of themselves and keep out of difficulty may properly be taken into consideration." *Johnson* v. *Railroad*, 20 N. Y. 65, 69–71.

In *Reynolds* v. *Railroad*, 58 N. Y. 248, 252, it was said "the jury might infer that the deceased was governed by the natural instinct of self-preservation, and would not put himself recklessly and consciously in peril of death." But it was also said "that men are careless and subject themselves thereby to injury is the common experience of mankind, and when injured, no presumption exists in the absence of proof that they were exercising due care at the time." In this remark, "absence of proof" apparently means absence of other proof than the instinct from which, it is admitted, the jury might infer that the deceased would not put himself recklessly and consciously in peril of death. Whatever

portion of mankind is intended when it is said that men are careless, their carelessness does not disprove the proposition that the natural and universal instinct is evidence of such care as a person of ordinary prudence would exercise under the circumstances. The test which the law finds in that degree of care is not altered by calling it negligence.

A person of ordinary prudence, exercising the caution and vigilance which the law has adopted as the test of duty, might make an extremely hazardous attempt to cross a railroad in front of a train. From the mere fact of great danger, it does not necessarily follow that he exposed himself recklessly and consciously. When there is no evidence of insanity, intoxication, or suicidal purpose, and no evidence on the question of his care, except the instinct provided for the preservation of animal life, it may be inferred from this circumstantial proof that, for some reason consistent with ordinary care and freedom from fault on his part, his attempt to cross was due to his inadequate understanding of the risk. In the full possession and vigorous use of his faculties, without even a momentary absence or preoccupation of mind, with his intelligence alert and diligently applied to the question of waiting for the train to pass, he might act upon an error of judgment in regard to the speed of the train and the time that would elapse before its arrival. There is reason to believe a mistake on this point is the cause of many accidents. A large portion of the community have such knowledge of the danger of crossing a street in front of a horse team moving at a moderate gait as is necessary in determining whether safety requires them to wait for the team to pass. But high rates of speed create a degree of danger that is not generally realized by those who have no special means of information on the subject. Whether a train is going twenty miles an hour or forty, is a question on which the opinion of but few observers would be considered valuable by a railway expert. In estimating time, distance, and rapid motion, the mass of men are inexpert. For various reasons, when they see a train at a considerable distance coming towards them at the rate of thirty-five or forty miles an hour, they have little ability to measure the danger of crossing in front of it. They are not ignorant of the probable consequences of a collision, but are likely to be misled by an erroneous view of the probability of a collision.

Reasonable care often depends upon actual knowledge, or reasonable and rightful expectation. *State* v. *Railroad*, 58 N. H. 408, 410 ; *Nutter* v. *Railroad*, 60 N. H. 483, 485. After a repeal of the statutory law of the road, a universal custom of turning to the right might be an important fact in cases of collision. If A, driving in a highway and turning to the right, were injured by B driving towards him and turning to the left, B might be liable, at common law, for negligence in not acting upon his presumed knowledge of the fact that A had reason to expect B would turn

to the right.    A jury could properly find that A exercised ordinary care in expecting, and acting upon the expectation, that B would comply with the custom.    Were B a foreigner, who had arrived an hour before the accident from a country in which the law of the road required travellers to turn to the left, his collision with A might be without actual fault in either party.    If A knew that B expected him to turn to the left, A might be negligent in turning to the right without giving due warning.    With his knowledge of B's ignorance, ordinary prudence might require him to slacken his speed, or turn to the left, or take other precautions to avoid collision.    A reasonably careful person, introducing dangers, in the use of force or the possession of destructive materials, on highways or elsewhere, with full knowledge of probable consequences, adopts the measures known by him to be necessary to avoid an unreasonable exposure of others to risks that are less apparent to them than to him.    His knowledge of their uninstructed and unskilled condition may be a material element of his duty.

Railway managers may be presumed to have special knowledge of the dangers of their business, and to be aware of the constant peril arising at level crossings from the fact that intelligent and careful people frequently overestimate the safety of attempting to cross in front of trains moving at high speed.    The danger thus caused was probably not foreseen when the defendants' road was built.    The speed required by public convenience on railways is found to be inconsistent with the public safety at level crossings where there are no gates or watchmen.    The expense of watchmen, or gates and watchmen, at all such crossings, would increase the cost of transportation.    Without such crossings, the expense of construction would have more nearly approached the cost of English roads, and the price of transportation would not have been so far below English rates as it now is.    But the practical difficulties resulting from the conflict of public interests do not change the legal principles applicable to this case, or affect the plaintiff's cause of action.    The knowledge which the defendants may be presumed to have of the fact that persons of ordinary prudence frequently go upon level crossings in front of moving trains, when they would wait for the trains to pass if they had been long employed as railway managers or trainmen, is a knowledge of a danger caused by high speed, and common misapprehensions and miscalculations.    The defendants, presumably aware of this customary danger and its cause, are bound to act upon their superior knowledge, and to take such precautions as men of ordinary prudence would take, under the circumstances, in their situation.    In this case, as in many others, it is a question of fact whether a person of ordinary prudence, operating the defendants' road with their knowledge of the dangers of level crossings, would guard against accidents by stationing flagmen there, or slackening the speed of the trains.    If wrong is done in the decision of questions of fact, it

cannot be legally prevented, or rectified by a judicial alteration of the law. It is probable that. the plaintiff's wife and her mother saw the train, and supposed they could safely cross the rails before it arrived. Their deafness might increase their vigilance; and it could be properly found that they should have been stopped by a flagman charged with the duty of correcting the fatal mistake into which persons of ordinary prudence are liable to fall at such crossings. *Eaton* v. *Railroad*, 129 Mass. 364.

*Judgment on the verdict.*

BLODGETT, J., did not sit: SMITH, CLARK, and BINGHAM, JJ., concurred: ALLEN and CARPENTER, JJ., dissented from the decision that there was evidence sufficient to warrant a finding of due care on the part of M., and expressed no opinion upon the question whether, assuming the engineer and fireman were not in fault, there was sufficient evidence of negligence on the part of the defendants.