Merrimack,
June 25, 1941. } No. 3260.

JOHN H. GILLINGHAM *v.* BOSTON & MAINE RAILROAD.

JOHN H. GILLINGHAM, *Adm'r v.* SAME.

HARRY C. BLAKE, *Adm'r v.* SAME.

434

*Murchie & Murchie* (*Mr. Alexander Murchie* orally), for John H. Gillingham as an individual and as administrator.

*Jacob M. Shulins*, for Harry C. Blake, Administrator, furnished no brief.

*Demond, Sulloway, Piper & Jones* (*Mr. Piper* orally), for the defendant.

PAGE, J. The plaintiffs claim that the defendant might be found negligent in any one of three respects that demand consideration.

I. It is said that the train was being operated at a negligent speed. The limit prescribed by the defendant's rules was thirty-five miles an hour at this crossing. There is no evidence that such a speed was improper. No witness estimated the speed on this occasion as greater than between thirty and thirty-five. Between the departure of the train from Newbury Station and the moment of accident, an elapsed time of eight minutes for a distance just under four miles indicated an average speed of less than thirty.

To meet this the plaintiffs argue from Mrs. Blake's testimony that she first saw the train soon after she passed a stump eighty-eight feet from the nearest rail; that her speed was then between twenty-five and thirty miles an hour; that she immediately braked as hard as she could; that when she first saw the train it was between the first and second poles (situated 119 and 262 feet respectively from the middle of the crossing); that possibly it was not quite half way between the second and the first poles; that she came to a stop with one front corner of the automobile on the crossing; that at the moment she stopped, the train was "a few feet away."

It is argued that the train traveled twice the distance of the automobile before it came to a stop, and the plaintiffs conclude that there is evidence that the speed of the train was 45 to 55 miles an hour. Such a conclusion would reflect an average speed for the automobile of 22.5 to 27.5 miles. Whether or not this speed conforms to the fact is extremely doubtful. Before applying her brakes, Mrs.

Blake set her speed as between 25 and 30. Since she came to a dead stop prior to the collision, the average of her speed, on her testimony, could not have been as high as 27.5. It may have been well under 22.5. Nobody can do more than guess.

The correct mathematical proportion is that the distance traveled by Mrs. Blake was to her average speed as the distance traveled by the train was to the train's speed. The last factor is the "unknown quantity" to be proved by the plaintiffs. If it is to be ascertained mathematically, the three other factors must be known. Concerning these three it is to be observed (1) that the distance traveled by Mrs. Blake was something less than eighty-eight feet, upon her own testimony, but how much, is left to guess-work; (2) that her speed, which was (a) somewhere between twenty-five and thirty miles until she applied her brakes at some unknown point, and (b) thereafter some unknown ratio of diminution to zero over an unknown distance, makes her average speed unknowable even with approximation; and (3) she could not tell with any exactness the position of the train when she first saw it. She said it was between the first and second poles, which were 143 feet apart, and though she thought it was "not quite half way to the first pole," she also said that she could not place it exactly and when asked "You are not very sure about it," replied "Well, it is very hard to say."

In the situation disclosed mathematical figuring would be entirely conjectural and valueless.

II. It is claimed that the train signals were not given as prescribed by P. L., c. 249, s. 23. The three trainmen testified positively that the whistle was blown; two said that the bell was rung, but the conductor was not sure about it. Two passengers, one a pensioner and the other an employee of the defendant, heard the whistle; one of them did not hear the bell, and the other was not sure.

Of the wholly disinterested witnesses, the express messenger heard both whistle and bell. The passenger who was to be a guest of the Gillinghams and whom Mrs. Blake purposed to meet at Bradford, the next station below, heard the whistle, but could not say about the bell. A man five hundred feet away heard the whistle, but not the bell. Another, forty rods away, heard the whistle and was positive that he heard the train-brakes applied thereafter.

A number of witnesses heard no signal, but were not listening and were not situated so that they would naturally hear the signals, if given. Two witnesses raised some question as to the timing between the whistle and the crash. One, five hundred feet north of the

crossing, back of a house on the west side of the highway, said he heard a whistle, followed by a crash in "perhaps a couple of minutes, something like that; that might be too long or too short, I can't say." The plaintiffs desire it to be understood that the whistle was sounded for the Morse Crossing, a mile further north, and not at all for the Bailey Crossing. The witness heard the whistle when it was "up back" of the house. Roughly the whistling post for the Bailey Crossing would be back of it. It was just as likely that the witness would be wrong about the elapsed time as about the direction of the sound. Since, in any event, he was unable to judge for which crossing the whistle was sounded, the jury could not conclude that it was not given for the Bailey Crossing, particularly since it does not appear that the witness was listening.

Another witness, working in the woods opposite the saw mill, said that between the whistle and the crash there were not many seconds, but there was an appreciable length of time. However, he testified definitely that the whistle sounded for both crossings. It could not be found, from the above testimony, that the plaintiffs had any significant evidence of failure to give the train signals. Those who failed to hear the whistle had some reason for not hearing. Those who heard the whistle would not necessarily in consequence hear the bell. There was positive evidence that both were sounded, and no persuasive affirmative evidence that they were not.

The only other witness was Mrs. Blake, the driver of the car, who testified that she was listening as she approached the crossing and that she heard neither whistle nor bell. While she was preparing to start from home, her father heard a whistle for the Morse Crossing, and thought it to be for the Bailey Crossing. What then happened is disclosed by her testimony. "Q. And as you left the house or just as you were getting into the car did your father say anything to you about the train? A. Yes. . . . He said: 'There goes the train' or 'The train has just gone.' I can't tell sure which. Q. Did you yourself hear any whistle at that time? A. No. . . . I was in the house. Q. Where was your father? A. Outdoors. Q. Was your driving window or any window in the car open so you could hear any whistle or bell there might be? A. Yes. Q. Whether or not you did notwithstanding your father had said the train had gone, pay attention to any whistle or bell? A. I looked just the same. Q. Whether or not as you approached you were listening just the same too? A. Yes, I was listening." This ended the direct examination by the plaintiffs' attorney.

On cross-examination it developed that the ventilator on her side of the car was open a half inch or so and the window on her mother's side (away from the source of sound) "was down about half way, I should say, perhaps, I don't know exactly." What, if any, noise was made by the car or its occupants does not appear. But in any event the arrangement was not suited to acute hearing, and it could not be found that it was so designed. Nor was there necessity for only such openings for sound. It was shortly after 3:30 (standard) of an afternoon in mid-May, and it was warm and clear. Though the witness said she was listening, she did not act as if she was listening. She testified that she knew that she could not get to the station to meet her guest when the train got in. She was relying on the train having passed the crossing. She was inattentive in looking, for the evidence is clear that she did not look, as she said she did, at the first point where she could have seen up the track, but some forty feet beyond that point. When the jury found her negligent they reached the only possible conclusion on the evidence as to her looking. She cannot fairly be thought to have listened attentively, if at all. This is not a case of a driver saying he listened for an expected train (*Lavallee* v. *Railroad*, 89 N. H. 323), but of one who says she listened for an unexpected train. It was a case of "circumstances not calculated to attract attention to the subject." *Stinson* v. *Railroad*, 81 N. H. 473, 474. Upon the record, her testimony that she heard no signal therefore has no affirmative value in establishing lack of a signal and has no tendency to meet the positive testimony to the contrary, some of it by entirely disinterested persons or persons who would naturally be inclined by the sympathy excited by this terrible accident to avoid testimony to a fact which was doubtful in their sensations and memory. *Kingsbury* v. *Railroad*, 79 N. H. 203.

III. The plaintiffs claim, finally, that the defendant owed to them a duty of special crossing protection. While there was some testimony, by Mr. Gillingham and others, that in certain weather conditions and at certain points, a listener could not tell whether a whistle was given at one crossing or the other, there was not the slightest evidence that the defendant was put upon notice that highway travelers might in some instances be misled.

The duty to provide special protection at crossings, such as crossing-tenders, gates and automatic lights, depends upon the special dangers inherent in the situation and upon the volume of traffic on highway and railroad. *Despres* v. *Railroad*, 87 N. H. 427. The

locomotive engineer said that the Bailey Crossing was dangerous "in a way." "They are all dangerous," he added. This does not warrant the conclusion that this crossing was specially dangerous. He further said that it was obscure, since the railroad approaches from the north on an eastward curve between trees. There was some evidence of partial obstruction of the view of a train. Yet the visibility from the highway at one hundred and twenty-five feet south of the nearest rail permitted sight of a train at least 250 feet above the crossing, while at seventy-nine feet, a train could be seen at least 500 feet up the track, as conclusively appears, the latter on the testimony of the civil engineer produced by the plaintiffs, the former on the evidence of photographs which are indisputable. The view was nowhere hidden completely (*Despres* v. *Railroad, supra*).

This situation has to be balanced with the amount of traffic. The defendant maintained only a single track, over which passed daily two trains each way. There were no evening trains. At the time of the accident the highway had been oiled from South Newbury to a point some hundreds of feet south· of the crossing, but trucking in connection with the saw mill had broken up the road badly. Further towards the south, the highway was a narrow country dirt road.

Between the crossing and South Newbury, located to the north on a main-traveled road to Sunapee and Newport, there were four houses in a distance of about a mile. South of the crossing, the first house was the Gillingham house, a half mile away. Continuing south, there were no houses for more than a half mile, then two near together. A quarter of a mile further, there was a fourth house, and at a corner, an undefined distance beyond, a few more. Somewhere in that direction there was a golf club, also a summer boarding-house. In recent years traffic over the road has increased ten per cent, but from what density or sparsity the evidence does not disclose. In the day time, there was "some" business traffic, the extent of which there was no attempt to disclose.

The only evidence of anything approaching heavy highway traffic related to summer evenings, when the defendant did not occupy the crossing. It could not be found that special protection was owed.

*Judgments for the defendant.*

All concurred.