Hillsborough, } No. 3796.
June 7, 1949. }

### SAHEED W. DAHAR *v.* BOSTON & MAINE RAILROAD.

*Wyman, Starr, Booth, Wadleigh & Langdell (Mr. Booth* orally),for the plaintiff.

*McLane, Davis, Carleton & Graf* and *Stanley M. Brown (Mr. Brown* orally), for the defendant.

DUNCAN, J. The collision occurred at dusk on a fair day, between six and half past in the evening, as the plaintiff drove his truck in an easterly direction over the Hall Street or Old River Road crossing. The defendant's train was northbound from Boston to Concord and consisted of a locomotive and twelve cars, travelling at a speed of fifty miles an hour. The headlight of the locomotive was lighted. The plaintiff had been travelling northerly on the Londonderry Turnpike at a speed of about thirty-five miles an hour. He reduced his speed to approximately fifteen miles an hour when he turned into Hall Street to approach the crossing, and was proceeding at a speed between five and ten miles an hour when the accident occurred. He estimated that he could stop his truck in twenty to twenty-five feet at fifteen miles an hour, and seven to fifteen feet at ten miles an hour.

The westerly rail of the northbound track, where the accident took place, was about one hundred fifty feet from the Londonderry Turnpike, measured along the line of Hall Street. The street intersects the defendant's tracks at an angle of fifty-two degrees. Before reaching the northbound main, the plaintiff proceeded up a short but rather steep grade, over a side track which was the high point of the grade, and across the southbound main track. The distance between tracks along the diagonal course of the street was approximately ten feet.

The crossing was within yard limits and work cars were stationed on the side track on both sides of the crossing, although the track extended north of the crossing for five or six hundred feet. A number of them, consisting of a compressor car, three trailers, and a derrick, were stationed north of the crossing commencing about thirteen feet from it. South of the crossing, eighteen and one half feet away, were three compressor cars which occupied the track for a distance of something over thirty-seven feet. There was evidence that these compressors were about seven feet high and would completely obstruct the view which a motorist going easterly would have of a train approaching on the northbound track over distances which varied according to the viewpoint. From a point 44 feet west of the nearest northbound rail, the portion of a train between points 62 feet and 293 feet south of the crossing would be invisible. From a point 39 feet from the rail, only so much of a train as was within 79 feet of the crossing could be seen; from a point 34 feet away, only so much as was within 121 feet of the crossing. A full view of the track to the south could not thereafter be obtained until a point on the sidetrack was reached, 29 feet from the westerly northbound rail. If the plain-

tiff proceeded at a speed of fifteen miles an hour and the train at fifty, when he was 44, 39, 34 and 29 feet from the westerly rail, the corresponding distances which the front of the train was from the crossing were approximately 146, 129, 113 and 97 feet. If the plaintiff's speed was less, the train was proportionately farther away.

Upon the same assumption that the plaintiff's speed was fifteen miles an hour and that of the train fifty, it was necessary for the plaintiff to look to the south at an angle of one hundred eleven and one half degrees from straight ahead, in order to see the train at any point where the view was not obscured by the compressors. However, because the construction of the truck afforded a view to the side only through the window in the door, the plaintiff's vision to the south was limited to a field within a lesser angle of ninety-nine degrees thirty minutes from straight ahead. There was therefore no time before the collision when he was able to see the train from the driver's seat, assuming the speeds previously mentioned.

Both the engineer and the fireman testified that warning of the approaching train was given by bell placed in operation at the whistling post 1,360 feet south of the crossing, and by statutory whistle signals commenced at the post and continued to the crossing. The plaintiff heard neither warning. The front of his truck was struck by the train, and the truck was carried some eighty feet north of the crossing.

By its motions and requests for instructions, the defendant brought in issue the sufficiency of the evidence to warrant a finding for the plaintiff. The requested instructions would have withdrawn from the jury consideration of certain issues of negligence, among them the issue of whether warning was given by the whistle and bell of the locomotive. The defendant requested an instruction that both were sounded from the whistle post to the crossing. In support of its exception to the denial of this request, it urges that the plaintiff's testimony that he heard neither signal was insufficient to support a finding that they were not given, or to counterbalance the direct evidence that they were, within the rule of *Morier* v. *Hines*, 81 N. H. 48, 53.

Direct evidence that the signals were given came from the engineer and the fireman. Of four trackmen who were standing by the work train, two testified that they heard both bell and whistle. A third, who had since left the defendant's employ was not asked about it, and the fourth was not called as a witness. The plaintiff's testimony was that although the left window of his truck was open, and al-

though his hearing was good, he heard neither whistle nor bell; and that he would have heard them had they been sounded. The plaintiff offered no other evidence upon the issue. His own testimony falls short of the "distinct affirmative evidence of the existence of negligence" necessary to warrant submission to a jury. *Paine* v. *Railway*, 58 N. H. 611, 613. It contained no direct statement that the signals were not given, and no assertion that the plaintiff was listening for them or was attentive to the possibility that such warnings might be sounded. Cf. *Stinson* v. *Railroad*, 81 N. H. 473, 474; *Phillips* v. *Railroad*, 81 N. H. 483; *Morrison* v. *Railroad*, 86 N. H. 176, 181; *Cyr* v. *Railroad*, 88 N. H. 278, 281; *Lavallee* v. *Railroad*, 89 N. H. 323, 324, 325.

As the plaintiff approached the crossing, his attention was undoubtedly distracted by the work train which obstructed his view, and the workmen in charge of it who stood nearby. If it may be inferred that he was listening for signals from the evidence that he was attentive in other respects, his failure to hear was explainable upon grounds other than failure of the signals. *Morier* v. *Hines*, *supra*, 53. The window of the truck which was toward the source of the sound was closed, and according to the testimony of one of the plaintiff's witnesses, "a solid body between the source of the sound and a person listening has a tendency to deflect and deaden the sound. . . . "

The state of the evidence presented more closely resembles that in *Morier* v. *Hines*, *supra*, than in the cases relied upon by the plaintiff. While the weight of the testimony of the defendant's witnesses might be affected by the circumstance that they were employees of the defendant, the plaintiff's burden of furnishing the basis for a finding that the signals were not given was not thereby lessened. *Morier* v. *Hines*, *supra*, 52. His evidence was not, as was the evidence in *Stinson* v. *Railroad*, *supra*, "direct and affirmative to the effect that the [signals] did not [sound]." P. 474. Accordingly, we are constrained to hold that the issue should have been withdrawn for lack of substantial evidence upon which to found a verdict for the plaintiff. *Collins* v. *Hustis*, 79 N. H. 446; *Kingsbury* v. *Railroad*, 79 N. H. 203; *Morier* v. *Hines*, *supra*; *Collette* v. *Railroad*, 83 N. H. 210, 216; *Despres* v. *Railroad*, 87 N. H. 427; *Smith* v. *Railroad*, 87 N. H. 246, 265. The defendant's exception to the refusal to give the substance of its requested instruction is sustained.

By other instructions requested by the defendant, the jury would have been instructed that "there is no evidence that the train was

being operated at an excessive rate of speed," and the issue of the need for special protection at the crossing would have been withdrawn. Both of these issues were submitted. The evidence that the train was travelling at a speed of fifty miles an hour was undisputed. The crossing was unprotected, except as warning was given by a cross-arm sign bearing the legend, "Railroad Crossing Stop Look and Listen." Because of the angle of the intersection, east bound motorists were obliged to look toward the rear in order to see the tracks for any considerable distance to the south. At best the view was partially, and for a distance wholly, obstructed by the compressors. The extent of rail traffic over the crossing was not disclosed, but it appeared that the line is the main line between Concord and Boston. There was some general evidence concerning the use of the highway. It appeared that Hall Street is a paved street connecting two principal arteries, the Londonderry Turnpike and the Daniel Webster Highway. There was evidence that it was "heavily travelled" at times, and that at other times "traffic will be practically negligible." It also appeared that a sizeable grain mixing plant of the Merrimack Farmers' Exchange is located close by the crossing, and the view disclosed that access to the plant was by means of the crossing. It also must have disclosed residences across the track.

Despite indicated deficiencies with respect to the use of the crossing, the evidence was nevertheless sufficient to warrant submission to the jury of the issues of the speed of the train, and the need for additional crossing protection. The speed at which trains are operated over a crossing bears directly upon the extent of protection reasonably to be required. In this case, because of the angle of intersection with the highway, greater protection might reasonably be considered necessary than in the case of a right angle intersection. Cf. *Despres* v. *Railroad, supra.* The risk of accident, and hence the need for special protection would also increase in proportion to the volume of high speed rail traffic, and any obstruction of the view. "The duty to provide special protection at crossings, such as crossing tenders, gates and automatic lights, depends upon the special dangers inherent in the situation and upon the volume of traffic on highway and railroad." *Gillingham* v. *Railroad,* 91 N. H. 433, 437. One of the "special dangers inherent in the situation" in this case arose from the location of the work train on the sidetrack. Another was the danger arising out of the use of the crossing by trucks constructed as was the plaintiff's. There was evidence tending to show that the view from a standard truck cab would be similarly limited. An inference that such trucks would

have occasion to use the crossing in visiting the grain plant and for other purposes was not unwarranted. The defendant was chargeable with knowledge of the character of the use commonly made of the crossing. With its superior knowledge of the risks of a limited view at such a crossing, it was charged with a correspondingly greater duty to guard against risks there present, particularly when they might not be so readily apparent to the ordinary man with his ordinary knowledge. Whether the defendant provided suitable protection against such risks was for the jury to determine. *Cyr* v. *Railroad,* 88 N. H. 281; *Carbone* v. *Railroad,* 89 N. H. 12; *Stocker* v. *Railroad,* 83 N. H. 401, 405; *Jones* v. *Railroad,* 83 N. H. 73, 75.

So also was the question of whether the defendant's train was operated at a reasonable speed in view of the minimum protection afforded at the crossing. "If, for the convenience of the public, the defendant deemed it necessary to run trains over a crossing where the view was thus obstructed, at a speed of . . . fifty miles per hour, it was for the jury to say whether ordinary prudence would not require more effective warning of the approach of trains than was furnished by the whistle and bell of the locomotive." *Jones* v. *Railroad, supra,* 76; *Collins* v. *Hustis, supra,* 449, 450. See also *Huntress* v. *Railroad,* 66 N. H. 185, 191; *Davis* v. *Railroad,* 68 N. H. 247, 251. A required reduction in the speed of trains approaching the crossing at least within the defendant's yard limit, if only sufficient to have delayed the arrival of this train by approximately a second, would have averted this accident; and although its arrival at the crossing coincided with that of the plaintiff, had it been travelling at a speed of thirty rather than fifty miles an hour, it would have been within his range of vision. The admitted speed of the train cannot in this case be held to have been reasonably prudent as a matter of law. The issues of speed and crossing protection were interrelated, and both were properly submitted to the jury.

The exceptions to the denial of requests for instructions that the headlight was lighted and that there was no evidence of causal negligence on the part of the engineer or fireman are without merit. There was no issue concerning the headlight, and none was submitted. *Morin* v. *Champlin,* 93 N. H. 422. The jury was told that the engineer was entitled to assume that the plaintiff would exercise reasonable care, and that there was no indication "to the engineer or fireman of this train" that he "was not using such care," so that the train had the right of way. The instructions on this issue were sufficiently favorable to the defendant.

The defendant's argument that the location of the compressors could not be found to constitute causal negligence is not now open to it. No exception was taken to the instructions relating to this point, and no request presented the claim now made.

Sufficient has been said to indicate that the motions for a nonsuit and a directed verdict were properly denied unless the plaintiff's contributory negligence was conclusively established. It could be found that in so far as his speed was concerned, he approached the crossing carefully. His failure to hear the warning signals if they were given was explainable by the evidence that the sound might not penetrate his truck. If he was negligent as a matter of law, it was because he failed to see the approaching train. It could be found that because of the relative speeds of the vehicles and the limited view afforded from the truck, he never could obtain a useful view of the track to the south. There was no evidence that the plaintiff was aware of this. He looked to his right shortly after he turned into Hall Street. He testified that he took his first "real" look when he was ten feet from the sidetrack, but he also testified to looking when he was twenty feet from it. As he crossed the sidetrack he looked to the right again, then looked to his left for trains on the next or southbound track. When he again looked to his right, the train was upon him, and no time for saving action remained.

The defendant argues that he used no care to make his look effective. From the point where he took his first "real" look, ten feet from the sidetrack, only 79 feet of the northbound track south of the crossing was visible, the rest being obscured by the compressors. From this evidence the defendant argues that if he did not look to the south at other times, he was negligent, and that if he did and failed to see the train he must likewise be found negligent. This argument ignores the effect of the plaintiff's truck as a limitation upon his vision. If he looked to his right from a point ten feet west of the sidetrack, his available view was not obscured by the compressors, because it was limited by the truck itself to less than 79 feet of the track. He had an unobstructed view as far south as he could see. If in fact he had previously looked from a point twenty feet from the sidetrack, it was there that his limited view was obstructed by compressors, although they actually obscured the view only between points 55 and 155 feet south of the crossing. From there, the truck limited the plaintiff's view to 107 feet below the crossing, of which distance the southerly 52 feet was obstructed by the compressors. Thus in the light of such knowledge as the plaintiff had, his next and "real" look

to the right when he was ten feet farther east was prudently taken, in that it was a point where so far as the view afforded him was concerned there was no obstruction.

It is not a fact, as the defendant argues, that if the plaintiff looked from a point between the rails of the sidetrack, the train must have been in view. To a person standing at this point it would have been visible, but it was not to the plaintiff. He was afforded a view of only 55 to 60 feet of the northbound track; and the train was farther than that from the crossing. Since the plaintiff was then less than ten feet from the nearest southbound rail he could be found justified in turning his attention to the north. He was also not over thirty feet from the nearest northbound rail, or about two seconds from it. By the time he could look south again it must have been, as he testified, too late for saving action.

The issue then resolves itself to this. Must the plaintiff be held negligent as a matter of law for failing to stop or to do more than avail himself of his limited view, because at 39 feet from the nearest northbound rail he could see only 70 feet south of the crossing, and at 29 feet from the rail he could see only 60 feet of track? We do not think that such a holding is required. The plaintiff was entitled to rely to some extent upon the view which he had when he entered Hall Street. From that point his view encompassed some 250 feet of track. Having such a view when he was perhaps five seconds from the track, he was not necessarily negligent in failing to appreciate that a train beyond that distance was a threat to his safety, or that the increasingly shorter view thereafter available to him was necessarily inadequate to reveal the train's approach. This was not a case of having no view of the track. He had some view. The section hands whom he passed gave no indication that a train was coming. Whether he should have appreciated that his view was inadequate and what more if anything he should have done, were questions for the jury. To leave his truck for the purpose of obtaining a better view might only have served to expose him to the risk of collision with a train not then visible, which could come within striking distance of the crossing while he returned to his vehicle and resumed his journey. "There is no rule of law that because the view was shut off, he should have stopped and listened or otherwise investigated in some particular manner." *Morrison* v. *Railroad,* 86 N. H. 176, 179. The failure to stop "does not conclusively prove . . . negligence." *Cyr* v. *Railroad,* 88 N. H. 278, 282.

The remaining request to the denial of which the defendant took

exception was as follows: "The railroad cannot be held responsible for the restricted vision from the cab of Dahar's truck." Granted that the defendant was not responsible for the manner in which the truck was constructed, the angle of the crossing was still a factor which contributed to produce the restriction of his view and the defendant was required to guard against possible consequences of it to persons driving vehicles in common use. Whether in the exercise of reasonable care the defendant should have foreseen the risk of accident arising from the situation presented, and taken greater precaution against it, was for the jury. The request was properly denied.

So far as other issues argued by the defendant are properly presented by its exceptions, they do not appear likely to arise upon retrial, and accordingly need not be considered. The order is

*New trial.*

All concurred.